WHITNEY and another, Respondents, vs. THE DETROIT LUMBER COMPANY, Appellant.

*November 7 — December 16, 1890.*

*Public lands: Fractional lots: Mistake in survey: Boundaries.*

The government survey and plat showed a fractional lot as containing twenty-six acres in the northern portion of the N. E. 1-4 of the N. W. 1-4 of a section, and bounded on the south by a lake which covered all the remainder of the E. 1-2 of the N. W. 1-4 of the section. In fact there was no lake on any part of said E. 1-2 of the N. W. 1-4 of the section. *Held*, that the purchaser of said fractional lot obtained title only to the N. E. 1-4 of the N. W. 1-4 of the section.

Whitney and another vs. The Detroit Lumber Co.

APPEAL from the Circuit Court for *Marinette* County. The facts are thus stated by Mr. Justice CASSODAY:

This action is to recover the value of 322,000 feet of white pine saw-logs, which had been cut from section 9 in township 39 N. of range 15 E., in Wisconsin, described and alleged to be worth $3,220, which it is alleged the defendant wrongfully took, May, 25, 1888, from the possession of the plaintiffs, and brought into Marinette county, and there unjustly detained, to the plaintiffs' damage in the sum stated, and for which value and damages judgment is demanded. The answer is a general denial. The action was tried by the court without a jury, and the court made and filed findings of fact and conclusions of law to the following effect:

· The shores of the lake within the boundaries of said section were the same in November, 1864, as at the time of the trial. In November, 1864, all the lands in said township were surveyed and subdivided by surveyors employed by the United States, and a plat thereof made and certified to the general land office by the surveyor general of the United States. Said survey and plat showed said lake as extending much further north and east in said section than the fact was or is, and the north shore thereof as extending entirely across the E. ½ of the N. W. ¼ of said section, and north of the north eighth line of said section, so as to leave but about twenty-six acres in said E. ½ of said N. W. ¼; and said lake extending so far into said section as to make all of the quarters of said section fractional. The lands in the W. ½ of the N. W. ¼ of said section were designated by said survey and plat as Lot 2; those in the E. ½ of the N. W. ¼ of said section as Lot 3; all the lands in the S. W. ¼ of said section as Lot 8; all the lands in the W. ½ of the N. E. ¼ of said section as Lot 4; all the lands in the W. ½ of the S. E. ¼ of said section as Lot 7; the lands in the S. E. ¼ of the N. E. ¼ of said section as Lot 5; the lands in the N. E. ¼ of the S. E. ¼ of said section as

Lot 6 (as is more exactly shown by a certified copy of said plat in the record, and made a part of the findings). Said survey and plat so made by the government were erroneous and did not correctly show the location of said lake within said section. While the end of the lake extends into the section from the west, no part of it extends to the E. $\frac{1}{2}$ of the N. W. $\frac{1}{4}$ of said section, but the shore of said lake extends into, and about half way across, the E. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$ of said section. The north shore of said lake intersects the west eighth line of said section about fifty rods south of the east and west quarter line. The correct location of said lake is as shown by the diagram made a part of the findings.[1]

[1] The above diagram of section 9 shows the situation with approximate correctness. It represents the lake as it appears upon the government

Prior to July 1, 1867, the plaintiffs' grantors entered and paid for and selected certificates of purchase for said lots 3, 4, 5, and 8 of said section, according to said government survey and plat. Prior to 1885 the plaintiffs became the owners in fee simple of said lots 3, 4, 5, and 8, and have ever since continued to own the same. During 1886 one James Long, claiming that the land in the said section between the shore of said lake and the meandered line of said shore, as shown by said government plat and survey, was unsurveyed land belonging to the United States, entered upon the same, cut a little timber on the S. E. ¼ of said N. W. ¼, built a small shanty thereon, and raised a few bushels of potatoes, planted among the fallen trees. During each of the years 1887 and 1888 said Long raised a few potatoes in the same place and manner. In the spring of 1888 he contracted with the defendant to sell it such timber as he had and should cut from the lands upon which he had so entered, and the same, when cut into saw-logs, amounted to 322,000 feet, board measure, and the same were sold and delivered by said Long to the defendant. Said Long has since retained the possession of said lands from which the timber in question was cut. The value of said logs in the boom at Marinette at the time of the commencement of this action was $9.50 per 1,000 feet, board measure, or $3,059 in the whole. There was no evidence of the value at any other time or place. Prior to the defendant's purchase of the same it was informed of the facts relating to Long's claim of title as stated. All the logs in question were so cut from the said S. E. ¼ of the N. W. ¼ of said section, which, according to such government survey, was wholly in the lake. According to the true plat and survey thereof, the lands from which such logs were so cut were

plat, while the shore line as it actually exists is shown by the dotted line M N. The logs in question were cut on the S. E. ¼ of the N. W. ¼ of the section, south of Pine river.— REP.

wholly south of the river delineated on said map. Said
river does not flow into said lake at all, but enters the
N. W. ¼ of said section from the east, some distance south
of the south line of the N. E. ¼ of that quarter section, and
runs westerly to the eighth line of said section, or there-
abouts, and then substantially follows the north and south
eighth line to the north line of the section. Said Long en-
tered upon the said lands in 1886, and continued in such
possession for the purpose of locating the same and other
adjacent lands as a homestead under the laws of the United
States. The defendant purchased said logs of Long in good
faith without any notice or knowledge that the plaintiffs
claimed title to said premises or the logs cut therefrom, ex-
cept such as might be imputed in law.

As conclusions of law the court found that "the plaintiffs
were, at the time said timber was cut, the owners in fee
simple of the premises from which it was cut, and entitled
to the possession of the same; that the timber as fast as
severed from the premises became the personal property of
the plaintiffs, and that they were entitled to the immediate
possession of the same; that the defendant wrongfully took
and now holds said logs; that the plaintiffs are entitled to
judgment against the defendant for the value of said logs,
to wit, $3,059, with interest thereon at seven per cent. from
the commencement of this action, and for costs; and it is
ordered that judgment be entered accordingly." From the
judgment entered thereon accordingly the defendant ap-
peals.

For the appellant there were briefs by *Van Dyke & Van
Dyke* and *Eastman & Mountain*, and oral argument by
*G. D. Van Dyke* and *E. C. Eastman*.

For the respondents there was a brief by *Fairchild &
Fairchild*, and oral argument by *H. O. Fairchild*.

CASSODAY, J. The logs in question were cut and removed
from the S. E. ¼ of the N. W. ¼ of the section, had it been

full. That forty, according to the United States government survey, was wholly in the lake, but, as a matter of fact, no part of it was ever in the lake, but the whole of the same was high and dry ground, except that Pine river, which is not a navigable stream, runs through the northern portion of it. The plaintiffs claim title to the *locus in quo* wholly by virtue of having acquired the title to fractional lot numbered 3 in said section, according to such government survey. That fractional lot, according to that survey, contained only twenty-six acres, and was wholly in the N. E. $\frac{1}{4}$ of the N. W. $\frac{1}{4}$ of the section, had the same been full, and no part of it was ever in the lake. The plaintiffs contend that, as the lake does not, and never did, in fact, touch the E. $\frac{1}{2}$ of the N. W. $\frac{1}{4}$ of that section, such fractional lot numbered 3 must be construed as extending south to the quarter line, and hence as including the whole eighty. On the other hand, the defendant contends that such fractional lot numbered 3 does not extend south of the eighth line, but is confined to the N. E. $\frac{1}{4}$ of the N. W. $\frac{1}{4}$ of the section.

Both parties cite, in support of their respective contentions, a decision of this court wherein it was held that " where there is a mistake in the government survey of a fractional lot, so that either the line of a meandered stream or a quarter-section line (both of which are called for by the survey as constituting the boundary between two fractions) must be abandoned, the quarter-section line should be adhered to as the more certain call." *Martin v. Carlin*, 19 Wis. 454, 88 Am. Dec. 696. That case is referred to approvingly in *Shufeldt v. Spaulding*, 37 Wis. 668, where the territory of Wisconsin acquired from the United States a fractional section of land which, according to the United States government survey, was wholly on the E. $\frac{1}{2}$ of the section, had it been full, and the same was thereon divided into three fractional lots in such a way that lots 1 and 2 were wholly in the N. E. $\frac{1}{4}$ of the section, and together con-

tained 119.40 acres, and lot 3 was wholly in the S. E. ¼ of the section, and contained 43.55 acres. According to such survey, the whole of the W. ½ of the section, and a portion of the E. ½, were covered by a lake. Upon a survey being made, it was found that there was a neck of land containing about seven acres running into the east side of the lake, and wholly on the N. W. ¼ of the section, had it been full, and which neck was inaccessible except from the lake or passing over the lands of the defendants. The defendants claimed title to the neck of land mentioned under and by virtue of a purchase of " the northeast fractional quarter" of the section, made in 1846, while the plaintiff claimed title to the same under a purchase from the state in 1869. The trial court directed a verdict in favor of the plaintiff, but the judgment thereon was reversed by this court, holding that the two fractions constituting the lands of the defendants extended west to the lake, notwithstanding such extension would carry them west of the north and south quarter line.

-  This court has repeatedly recognized the principle " that whenever the question in any court, state or federal, is whether a title to land which had once been the property of the United States has passed, that question must be resolved by the laws of the United States." *Wilcox v. Jackson*, 13 Pet. 517; *Paige v. Peters*, 70 Wis. 182; *Wis. Cent. R. Co. v. Wis. R. Land Co.* 71 Wis. 99.

The real question here is whether the title to the *locus in quo*, which, according to the government survey and plat, was in the lake, passed from the United States by reason of the patent given to fractional lot numbered 3, or remained in the United States. It has long been the settled rule that " when lands are granted according to an official plat of their survey, the plat, with its notes, lines, descriptions, and landmarks, becomes as much a part of the grant or deed by which they are conveyed, and, so far as limits

are concerned, controls as much as if such descriptive feat-
ures were written out on the face of the deed or grant."
*Cragin v. Powell*, 128 U. S. 691; *Jefferis v. East Omaha
Land Co.* 134 U. S. 178; *Shufeldt v. Spaulding*, 37 Wis. 668.
The statutes of the United States declare that "the public
lands shall be divided by north and south lines run accord-
ing to the true meridian, and by others crossing them at
right angles, so as to form townships of six miles square,
unless" one of the circumstances therein named "may ren-
der this impracticable, and in that case this rule must be
departed from no further than such particular circum-
stances require." Sec. 2395, R. S. of U. S. The same sec-
tion requires townships to be subdivided into sections by
parallel lines running each way. So the statute of the
United States declares that "the boundaries and contents
of the several sections, half sections, and quarter sections
of the public lands shall be ascertained in conformity with
the principles stated" in sec. 2396, R. S. of U. S. Among
the principles thus stated are those to the effect that "all
the corners marked in the surveys," and "the boundary
lines actually run and marked in" such surveys, and "the
contents" of each section or subdivision thereof returned
by the surveyor general, shall be established as the proper
corners, and as the proper boundary lines, and as contain-
ing the exact quantity expressed in such return. *Ibid.*
Among the principles stated in that section are also those
to the effect that the corners of half and quarter sections
not marked on the surveys shall be placed, as nearly as pos-
sible, equidistant from two corners which stand on the same
line; that the boundary lines which have not been actually
run and marked shall be ascertained by running straight
lines from the established corners to the opposite corre-
sponding corners, but, in those portions of the fractional
townships where such opposite corners have not been or
cannot be fixed, such boundary lines shall be ascertained

by running from such established corners due north and south or east and west lines, as the case may be, to the watercourse, Indian boundary line, *or other external boundary* of such fractional township; that the contents of such half sections and quarter sections as have not been thus returned shall be held and considered as containing the one-half or the one-fourth part, respectively, of. the returned contents of such sections. *Ibid.* The statute also provides, in effect, that in every case of the division of a quarter section the line for the division thereof shall run north and south, and the corners and contents of half quarter sections which may thereafter be sold shall be ascertained in the manner and on the principles directed and prescribed by said sec. 2396, and fractional sections containing 160 acres or upwards shall, in like manner, as nearly as practicable, be subdivided into half quarter sections, under such rules and regulations as may be prescribed by the secretary of the interior; and in every case of a division of a half quarter section, the line for the division thereof shall run east and west, and *the corners and contents of quarter quarter sections* which may thereafter be sold shall be ascertained, as nearly as may be, in the manner and on the principles directed and prescribed by said sec. 2396; and fractional sections containing fewer or more than 160 acres shall, *in like manner*, as nearly as may be practicable, *be subdivided into quarter quarter sections* under such rules and regulations as may be prescribed by the secretary of the interior. Sec. 2397, R. S. of U. S.

As observed, no part of the E. ½ of the N. W. ¼ of the section was ever covered or touched by the lake. According to such survey and map, and probably according to the true survey, fractional lot numbered 8, in the section, covered and included all the land in the S. W. ¼ of the section not covered by the lake. The important question is whether fractional lot numbered 3, which, according to the govern-

ment survey and map, contains twenty-six acres in the northern portion of the N. E. $\frac{1}{4}$ of the N. W. $\frac{1}{4}$ of the section, should be extended south to the quarter line, and thus be made to contain eighty acres, or be limited by the eighth line, and thus be made to contain only forty acres.

It is true that according to such government survey and map the meandered line of the lake was wholly on the S. $\frac{1}{2}$ of the N. E. $\frac{1}{4}$ of the N. W. $\frac{1}{4}$ of the section. In *Railroad Co. v. Schurmeir*, 7 Wall. 286, Mr. Justice CLIFFORD, speaking for the whole court, said: "Meander lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, *not as boundaries of the tract*, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction, subject to sale, and which is to be paid for by the purchaser. In preparing the official plat from the field-notes, the meander line is represented as the border line of the stream, and shows to a demonstration that the watercourse and not the meander line, as actually run on the land, is the boundary." This is in accordance with *Boorman v. Sunnuchs*, 42 Wis. 233; *Menasha W. W. Co. v. Lawson*, 70 Wis. 600, and was followed by Secretary VILAS in *Re Hemphill*, 6 Dec. Dep. Int. 555, and has since been fully sanctioned in *Jefferis v. East Omaha Land Co.* 134 U. S. 196, affirming *S. C.* 40 Fed. Rep. 386.

Manifestly, the southern boundary of fractional lot numbered 3, *according to such government survey and map*, was the northern shore of the lake; but since no part of the lake was ever upon, or even touched, the E. $\frac{1}{2}$ of the N. W. $\frac{1}{4}$ of the section, and since, as is conceded, upon the facts in the record, that fractional lot numbered 3 can in no event extend south of the quarter line, it is very evident that the call, according to a government survey and map, of a lake boundary on the southerly side of fractional lot numbered 3, cannot, in such absence of such lake, be answered at all,

and hence we are forced to seek some other southern boundary line to that fractional lot. *White. v. Luning*, 93 U. S. 514; *Heaton v. Hodges*, 30 Am. Dec. 731, note, page 740. Since there is no lake there which can constitute such southern boundary, the question recurs, What line must constitute the same? Is it the quarter line, as contended by the plaintiffs, or the eighth line, as contended by the defendant? The federal statutes cited manifestly contemplate chamber subdivisions into quarter quarter sections as well as half quarter sections, when, as here, the government survey and map fail to make or designate such subdivisions. *Gazzam v. Lessee of Phillips*, 20 How. 372; *Cragin v. Powell*, 128 U. S. 691; *Schraeder M. & M. Co. v. Packer*, 129 U. S. 688; *Keyser v. Sutherland*, 59 Mich. 455. The facts make a case much stronger for the defendant than the Gooselake Case, where Secretary Vilas held that "where the meander line of a survey bordering upon a lake was established at a time of extreme high water, and the subsequent recession thereof, which occurred shortly after the survey, left a large body of land between said meander line and the permanent shore line, it is held that such reliction is the property of the government, and should be included within the system of public surveys." 2 Copp, Pub. Land Laws, 1890, p. 1055. We must hold that fractional lot numbered 3 extended no further south than the eighth line; or, in other words, that it is confined to the N. E. $\frac{1}{4}$ of the N. W. $\frac{1}{4}$ of the section, had it been full.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded with direction to dismiss the complaint.