MENDOTA CLUB, Appellant, vs. ANDERSON and another, Re-
spondents.

*November 29, 1898 — January 10, 1899.*

*Appeal: Exceptions by respondents: Tax deeds: Sufficiency of descrip-
tion: Public lands: Patents: Title to navigable lakes, etc.: Raising
of water by dam: Rights of navigation.*

| | |
|---|---|
| 101 | 479 |
| f103 | 275 |
| 103 | 277 |
| 103 | 550 |
| 104 | 621 |
| 101 | 479 |
| 109 | 539 |
| 101 | 479 |
| 114 | 955 |
| 114 | 2123 |
| 114 | 5186 |

1. On appeal an exception taken by respondent to an erroneous finding
in favor of the appellant is available in support of the judgment.
2. The sufficiency of the description of the land in a tax deed is, under
the provisions of sec. 1047, Stats. 1898, to be determined by the
same rules as are applicable to ordinary conveyances. If it is im-
possible to definitely locate the premises conveyed thereby in the
light of contemporaneous facts, the deed is void for uncertainty.
3. A tax deed which describes the premises as 140 acres in the east
part of a certain fractional quarter section on the north shore of a
lake may be construed as covering a strip of uniform width off the

east part or side of the quarter section, and is not void for uncertainty if the south and west lines are capable of being fixed by extrinsic evidence.

4. The question whether the title to land which has once been the property of the United States has passed must be resolved by the laws of the United States; and meander lines run in surveying fractional portions of the public lands bordering upon navigable waters are not to be deemed the boundaries of the tract, but the water is the actual boundary.

5. Although a patent from the United States, purporting to convey swamp lands, or mineral lands, or lands subject to pre-emption or homestead entry, cannot be impeached in an action at law, much less collaterally, yet the Interior department is nowhere authorized to dispose of any lake or any section or fraction of a lake, by patent or otherwise; and a patent which purports to cover any portion of a navigable lake is to that extent inoperative and void, though it may be valid in so far as it covers dry land.

6. The title to and absolute dominion over all lakes within its borders is conceded to the state. subject only to the constitution of the United States and the acts of Congress and treaties made in pursuance thereof, and subject to certain limitations on the power of the state.

7. In this state the riparian proprietor upon navigable lakes and ponds takes title to the land only to the water's edge.

8. Since 1850 the waters of a lake and of a navigable stream had been raised by a permanent dam to such an extent as to increase the submerged area. *Held*, that a tax deed issued in 1874 was void so far as it covered or purported to cover portions of the lake, whether originally such or made so by the erection of the dam.

9. In such a case the public had the right to navigate the waters over the entire submerged area after they were increased in volume, the same as though they had always been in that condition.

APPEAL from a judgment of the circuit court for Dane county: R. G. SIEBECKER, Circuit Judge. *Affirmed*.

This action was commenced October 15, 1897, to restrain the defendants from going upon the premises described, with skiffs or boats or otherwise, for the purpose of hunting or shooting wild ducks or other wild fowls or game; and the plaintiff claims to be the exclusive owner of such premises, and that the defendants were trespassers thereon. _ The defendants, answering upon the merits, deny the plaintiff's

Mendota Club vs. Anderson and another.

title to the premises, and allege, in effect, that such premises were mostly covered with water, and constituted a part of Lake Mendota, and that the defendants, in common with others, only went thereon with boats to fish and shoot duck and other wild fowl. The premises in question are on the north end or side of Lake Mendota, and west of what is or was the channel of Catfish creek, and south of Six Mile creek, which runs east and west and empties into Catfish creek near the center of section 27; the premises being what would constitute a part of the S. W. $\frac{1}{4}$ of section 27, and the S. E. $\frac{1}{4}$ of section 28, in the town of Westport. The cause having been tried, the court found, as matters of fact, in effect:

(2) That the plaintiff was incorporated December 7, 1891, for shooting, fishing, and exercise, and empowered to buy, lease, own, occupy, and possess real estate for such purposes.

(3) That, prior to 1836, sections 27 and 28 were surveyed by the United States, and Lake Mendota meandered, and that by such survey those sections were divided into the usual government subdivisions.

(4) That the plaintiff has a complete chain of record title to the description contained in the deeds offered in evidence.

(5) That the plaintiff has not had possession of any part of the S. W. $\frac{1}{4}$ of section 27, or of any part of the S. E. $\frac{1}{4}$ of section 28, or exercised acts of ownership thereon, except it had for several years employed a watchman to look after the premises, and its other premises in the same locality, and planted celery seed, corn, and feed for wild ducks, and put up signs in and around the premises warning trespassers away from the same, and ordering away persons hunting in boats upon the premises in question.

(6) That the map Exhibit E was correct; that Lake Mendota is a navigable lake, some twenty-five miles in circumference; that such lake was meandered by the United States prior to 1836; that a portion of such meandered line constituted the south line of the premises in question, and

the same was in the segment of a circle, with the south lines
of such sections projected for the chord, and the arc extend-
ing northward; that extending from Catfish creek, near the
center of section 27, is a channel commonly known as the
Catfish channel, running southward into the body of the lake;
that such channel at its mouth is about 200 links wide; that
the premises in question are at the west of that channel,
and west of the north and south line through the middle
of section 27; that all west of that channel and south of
Six Mile creek was water at or about the time of the com-
mencement of this action, when the waters of the lake were
at an exceptionally low stage, except that there existed near
the mouth of Six Mile creek a piece of bog land known as
Crescent bog, and also except that there was a considerable
space immediately south of Six Mile creek, and in the N. E. ¼
of the S. E. ¼ of section 28, and a small portion in the north-
west corner of the N. W. ¼ of section 27, and here and there
patches, where green vegetation extended from the ground
through the water.

(7) That what is known as Farwell dam was completed
during 1850, at the outlet of Lake Mendota, on the south
side thereof.

(8) That prior to the erection of that dam there was a sand
bar extending from at or near the high land easterly of the
south end of Catfish channel, westerly to the east side of the
south end of the channel, and extended from the west side
of the south end of the channel, in a westerly direction, to-
wards dry land to the west; that the bar, before the erection
of the dam, was exposed above the surface of the water for
a considerable distance from the west side of the channel,
but not for the whole distance to the west shore, at the west;
that before the dam was erected, and at ordinary stages of
water, a portion of the bar west of the Catfish channel was
submerged and covered by water to such a depth as to per-
mit rowboats to pass from the body of the lake south of the
bar to the water north thereof, as stated.

(9) That the precise location of the bar with respect to the meandered line, before the erection of the dam, is not shown by the testimony, but that, as the same now exists, portions thereof, both in sections 27 and 28, are considerably to the north of the meandered line, following the meandered line in a general way, though at some places considerably nearer the line than at other places.

(10) That, as the bar approaches the shore at the west, the same flattens out and becomes indistinguishable for a considerable distance before it reaches the west shore line.

(11) That before the erection of the dam there was water upon a considerable portion of the area covered by, and included within, the government survey of sections 27 and 28, where water existed at the time of the commencement of this action, and a portion of the area so covered with water contained bogs, and a portion thereof adjacent to or near the west side of the Catfish channel was hard land with grass growing thereon; but aside from the boggy portions and hard lands, and aside from the bar, an area nearly as large as is now covered by water could not, before the erection of the dam, be used for agricultural purposes.

(12) That after the erection of the dam the waters of the lake were raised to some extent, and the dry land referred to was somewhat lessened in extent, so that a less portion of the bar and the land upon which grass grew, near the Catfish channel, remained exposed in the ordinary stages of water.

(13) That since the erection of the dam the depth of the water in the area north of the meandered line, at ordinary stages of water, has varied from shallow water in certain places to the depth of a number of feet in other places.

(14) That the Catfish creek is a navigable stream, and is and has been navigable for all such boats as are commonly used upon the lake.

(15) That since the erection of the dam the area of the water west of the Catfish channel, and south of Six Mile

creek, described, is and has been continuously navigable for rowboats and sailboats, and has been continuously used for navigation by small boats, in connection with hunting, boating, and fishing.

(16) That, on one or two occasions in each of the years 1895, 1896, and 1897, the defendants were upon the area of water last mentioned, and north of the bar, and within the limits of the S. W. ¼ of section 27, and the easterly part of the S. E. ¼ of section 28; that on one of the occasions they stood upon one of the exposed portions of the bar in section 27, but there is no evidence that the portion of the bar on which they so stood constitutes a part of the premises claimed by the plaintiff; that on all other occasions they were in their boats upon the waters north of the bar described.

(17) That on the occasion when the defendants were at such places they were engaged in hunting wild ducks; that, in so hunting wild ducks, the defendants on the occasions were accustomed to row their boats into bunches of rushes or vegetation, which in places arose above the surface of the water, in order that they might be concealed by such rushes or vegetation from the wild ducks flying over them, and were accustomed to place decoys about their places of concealment, but in so doing did no injury to any rushes or vegetation there growing.

And, as conclusions of law, the court found, in effect, that the area of water where the defendants were found shooting at the times in question is a part of Lake Mendota, and that, though the plaintiff has established a record title, no right has vested in it, to the exclusion of the public, to use this body of water for the purpose of fishing, hunting, and boating, and that for this reason the relief demanded should be denied, with judgment for costs in favor of the defendants.

From the judgment entered thereon accordingly the plaintiff brings this appeal.

*R. M. Bashford* and *Frank M. Wootton*, for the appellant, argued, *inter alia*, that the plaintiff had record title to the premises in question from the United States, which carried with it the constructive possession. *Gunsolus v. Lormer*, 54 Wis. 630. That title was not subject to be impeached in an action at law by showing that the land was not patentable. *French v. Fyan*, 93 U. S. 169; *Johnson v. Towsley*, 13 Wall. 72; *Ehrhardt v. Hogaboom*, 115 U. S. 67; *Steel v. Smelting Co.* 106 U. S. 447. Submerged lands may be conveyed by the government, even when under tide water or below high-water mark. *Hardin v. Jordan*, 140 U. S. 371; *Stockton v. B. & N. Y. R. Co.* 32 Fed. Rep. 9, 19, 20; *People v. N. Y. & S. I. F. Co.* 68 N. Y. 71, 76; *Hanford v. St. P. & D. R. Co.* 43 Minn. 105; *Bradshaw v. Duluth I. M. Co.* 52 id. 61; *Ledyard v. Ten Eyck*, 36 Barb. 102; *Weber v. Harbor Comm'rs*, 18 Wall. 57; *Hoboken v. Pennsylvania R. Co.* 124 U. S. 656, 657; *Stevens v. P. & N. R. Co.* 34 N. J. Law, 532; *Langdon v. New York*, 93 N. Y. 129, 155. A riparian proprietor has a right to reclaim and occupy lands under shallow water, and to convey them independently of the land on the original bank. *Gilbert v. Eldridge*, 47 Minn. 210; *Yates v. Judd*, 18 Wis. 118; *Northern P. L. Co. v. Bigelow*, 84 id. 153. Submerged and overflowed lands, flats, and bays are the subject of private ownership. *Hogg v. Beerman*, 41 Ohio St. 81. The erection of a dam may have given the proprietor a right to flow the lands, but that would not defeat the right of the landowner to the exclusive possession subject to the easement. *Reysen v. Roate*, 92 Wis. 543; *Stevens Point B. Co. v. Reilly*, 44 id. 295; *Kuhl v. C. & N. W. R. Co., ante*, p. 42. The right of hunting and fowling is in the owner of the land, even though it be overflowed, and generally in the riparian proprietor. *Ne-pee-nauk Club v. Wilson*, 96 Wis. 290; 8 Am. & Eng. Ency. of Law, 31; Washburn, Easements, *410; *Bristow v. Cormican*, 3 App. Cas. 641; *Beckman v. Kreamer*, 43 Ill. 447, 448; Gould, Waters, §§ 80–83; *Lembeck v. Nye*, 47 Ohio

St. 336; *Sterling v. Jackson,* 69 Mich. 488; *Chisholm v. Caines,* 67 Fed. Rep. 285, 294.

For the respondents there was a brief by *Olin & Butler,* and oral argument by *H. L. Butler.*

CASSODAY, C. J. The evidence is voluminous, covering nearly 200 printed pages. No attempt will be here made to analyze such evidence or to discuss it in detail.

1. The defendants except to the fourth finding of fact, wherein it is found that "the plaintiff has a complete chain of record title to the description contained in the deeds offered in evidence." Such exception by the respondents is, of course, permissible in support of the judgment. Sec. 3070, Stats. 1898; *Maxwell v. Hartmann,* 50 Wis. 664; *Hoey v. Pierron,* 67 Wis. 262; *Hackett v. W. U. Tel. Co.* 80 Wis. 187.

To support such title, the plaintiff relies upon the facts that the S. W. fractional quarter of section 27, and the S. E. fractional quarter of section 28, were entered in 1836 by one Lyon; that a patent was issued therefor to one Nicholas, as grantee of Lyon, August 10, 1837, and the same was recorded May 26, 1840; that L. J. Farwell gave a quitclaim deed thereof to one Ring, in 1851; that Nicholas gave Farwell a warranty deed thereof in 1854; and that each of such conveyances was recorded about the times they were, respectively, given; but no conveyance is shown from Ring, nor from Farwell, aside from the quitclaim deed mentioned. Such conveyances, and the government survey and meandered line, were put in evidence, it would seem, for the purpose of showing that the premises were subject to taxation, and hence that the tax deeds under which the plaintiff claims title were valid. One of such tax deeds was issued to one W. W. Tredway, May 14, 1874, and recorded four days afterwards, and purported to convey, among other premises, the "east part of southeast ¼ of section 28, town-

Mendota Club vs. Anderson and another.

ship 8, range 9; number of acres, 140." Tredway conveyed the premises last described to one C. P. Chapman, September 19, 1885; and Chapman conveyed the same to one J. D. Clarke, November 24, 1891; and Clarke conveyed the same to the plaintiff, December 21, 1891; and such conveyances were recorded about the times they were, respectively, made. The other of such tax deeds was issued to one John Schlimgen, October 26, 1889, and recorded the same day, and purported to convey the "west part southwest ¼, *except lake*, section number 27, township number 8, range number 9; number of acres, 100." December 5, 1891, Schlimgen gave J. D. Clarke a contract for the sale and conveyance of the same, and February 8, 1898, Clarke gave to the plaintiff a quitclaim deed of the same. The defendants contend that each of the two tax deeds under which the plaintiff so claims title is void for uncertainty as to the premises so described.

Under our statutes, the question of uncertainty in the description in tax deeds must be determined by the same rules as are applicable to ordinary conveyances between grantor and grantee. Stats. 1898, sec. 1047. *Meade v. Gilfoyle*, 64 Wis. 18, 22. Of course, such tax deeds, like other deeds, are to be construed with reference to the actual rightful state of the property at the time of their execution; and, for such purpose, extrinsic evidence is often admissible in order to place the court in the position of the parties at the time of making the deed, and thus enable the court to intelligently construe the language employed. *Messer v. Oestreich*, 52 Wis. 689, 691; *Meade v. Gilfoyle*, 64 Wis. 23, and cases there cited; *Reinhart v. Oconto Co.* 69 Wis. 352. But when, in the light of contemporaneous facts and circumstances, it is impossible to definitely locate the premises so attempted to be described, then courts are, necessarily, compelled to hold the conveyance void for uncertainty. Thus a tax deed has been held void for uncertainty which described the land as "lot 3, and the northeast quarter of the northwest quarter,

less seven acres, of section 5," of a specified township. *John-son v. Ashland L. Co.* 52 Wis. 459, 465. So, it has been held that a tax deed of lot 1, in block 1, of an addition designated by initials only, and without naming the city or village, was fatally defective. *Campbell v. Packard*, 61 Wis. 88. So, under an act of the legislature requiring the assessor's book in the city of Oconto to be kept in a certain way, it was held that, "notwithstanding such act, . . . a description in tax certificates of land in the city of Oconto, as 'part 5 of lot 4 of section 20, town 28 north, of range 22 east,' without referring to said act, or to any book or map made in pursuance thereof, or to any other record, plat, or description, is so indefinite and uncertain as to be fatally defective." *Murphy v. Hall*, 68 Wis. 203. So, this court has held that, "a deed purporting to convey the southeast corner of a certain quarter section of land, and the south-west fractional part of the north half of another quarter section, without more definite description as to dimensions, quantity, or location, is void for uncertainty." *Morse v. Stock-man*, 73 Wis. 89.

Applying such rules to the case at bar, it is very obvious that the tax deed to Schlimgen is not available to the plaintiff in this controversy. It called for 100 acres in the west part of the quarter section, *except the lake*, which, of course, means the lake as it existed when the deed was made. The controversy here is as to whether the *locus in quo* did or did not constitute a portion of the lake so expressly excepted. The court found that it did; and so, even if the uncertainty in the amount of lake, so excepted, and the uncertainty in the location of the south line and the east line, were not such as to avoid the deed, yet it gave the plaintiff no rights as against the defendants in this controversy. But the question whether the description in the tax deed to Tredway does or does not, on its face, cover the premises in controversy, is not so obvious. One hundred and forty acres in

the east part of the S. E. ¼ of section 28 seems to include water as well as land; and hence may, in harmony with decisions of this court, be construed as covering a strip of equal width off the east part or side of the quarter section. *Jenkins v. Sharpf*, 27 Wis. 472; *Dolan v. Trelevan*, 31 Wis. 147; *Riha v. Pelnar*, 86 Wis. 413. True, the location of the south line is not definitely fixed, and the location of the west line is not definitely fixed; yet it may be that, under one of the rules of law suggested, they were capable of being fixed by extrinsic evidence. For the purposes of this case, it is assumed that they were capable of being so fixed.

2. The question recurs whether the plaintiff, by virtue of the tax deed to Tredway, or any of the deeds or papers in evidence, acquired any special right or title to any portion of the premises covered by water, and which the court found to be a part of Lake Mendota. Counsel for the plaintiff contends that the Farwell dam, completed in 1850, raised the water of the lake at that point four feet higher than it was previously; and that it raised the water on the premises in question, at an ordinary stage thereof, some two or three feet higher than it was previously. The court found that before the erection of the dam, and at ordinary stages of water, a portion of the bar west of the Catfish channel was submerged and covered with water to such a depth as to permit rowboats to pass readily from the body of the lake south of the bar to the water north of the bar; and that there was water upon a considerable portion of the area included within the government survey of the two sections mentioned; and that a portion thereof contained bogs; and that, aside from such bogs and hard land near the west side of the Catfish channel, there was an area, nearly as large as now covered by water, which could not, before the erection of the dam, be used for agricultural purposes. It is undoubtedly true that the question whether the title to land, which has once been the property of the United States, has passed,

must be resolved by the laws of the United States.  *Wilcox v. Jackson*, 13 Pet. 517; *Whitney v. Detroit L. Co.* 78 Wis. 246, and cases there cited.  So, it is well settled that meandered lines must yield, in case of conflict, to section and quarter section lines.  *Martin v. Carlin*, 19 Wis. 454; *S. C.* 88 Am. Dec. 696; *Shufeldt v. Spaulding*, 37 Wis. 668; *Whitney v. Detroit L. Co.* 78 Wis. 245.  The supreme court of the United States has held that "meander lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser.  In preparing the official plat from the field notes, the meander line is represented as the border line of the stream, and shows to a demonstration that the water-course, and not the meander line, as actually run on the land, is the boundary."  *Railroad Co. v. Schurmeir*, 7 Wall. 286; *Hardin v. Jordan*, 140 U. S. 381.  To the same effect, *Boorman v. Sunnuchs*, 42 Wis. 233; *Menasha Wooden Ware Co. v. Lawson*, 70 Wis. 600; *In re Hemphill*, 6 Land Dec. Dep. Int. 555, per Vilas, Sec. Int.; *Jefferis v. East Omaha Land Co.* 134 U. S. 196, affirming *East Omaha Land Co. v. Jeffries*, 40 Fed. Rep. 386; *Whitney v. Detroit L. Co.* 78 Wis. 249.

It may be conceded that a patent from the United States, purporting to convey swamp lands, or mineral lands, or lands subject to pre-emption or homestead entry, cannot be impeached in an action at law,— much less collaterally.  *Johnson v. Tousley*, 13 Wall. 72; *French v. Fyan*, 93 U. S. 169; *Smelting Co. v. Kemp*, 104 U. S. 636; *Steel v. Smelting Co.* 106 U. S. 447; *Ehrhardt v. Hogaboom*, 115 U. S. 67.  But, as indicated in some of these cases, the Interior department has no power to dispose of any portion of the public domain, except as authorized by Congress.  The statutes of the United States prescribe the manner in which the public lands must

be surveyed, and require the surveyor to note in his field book the true situations of "*all watercourses* over which the line he runs may pass" (R. S. of U. S. sec. 2395, subd. 7), and also require him to ascertain the boundaries and contents of sections, half sections, and quarter sections; "and the boundary lines which have not been actually run and marked shall be ascertained, by running straight lines from the established corners to the opposite corresponding corners; but in those portions of the fractional townships where no such opposite corresponding corners have been or can be fixed, the boundary lines shall be ascertained by running from the established corners due north and south or east and west lines, as the case may be, *to the watercourse*, Indian boundary line, or other external boundary of such fractional township." R. S. of U. S. sec. 2396, subd. 2. But the Interior department is nowhere authorized to dispose of any lake, or any section or fraction of any lake, by patent or otherwise, notwithstanding nearly 300 sections of the federal statutes are devoted to the public lands. R. S. of U. S. secs. 2207–2490.

By admitting the state into the Union, the federal government, in effect, conceded that the state should have the title to, and absolute dominion over, all such lakes within its border, subject only to the constitution of the United States and acts of Congress, and treaties made in pursuance thereof, and subject to certain limitations on the power of the state. *Priewe v. Wis. State L. & I. Co.* 93 Wis. 534. Thus, it has been held that "Congress has not undertaken, by general laws, to dispose of lands below high-water mark of the tide waters in a territory, but, unless in case of some international duty or public exigency, has left the administration and disposition of the sovereign rights in such waters and lands to the control of the states, respectively, when admitted into the Union." *Shively v. Bowlby*, 152 U. S. 2. So, it has been held that "grants by the United States of its public lands

bounded on streams and other waters, made without reserva-
tion or restriction, are to be construed, as to their effect,
according to the law of the state in which the lands lie."
*Hardin v. Jordan*, 140 U. S. 371. To the same effect, *Illi-
nois Cent. R. Co. v. Illinois*, 146 U. S. 387. The same court
has held that "whatever incidents or rights attach to the
ownership of property conveyed by the United States, border-
ing on navigable streams, will be determined by the states
in which it is situated, subject to the limitation that their
rules do not impair the efficacy of the grant, or the use
and enjoyment of the property by the grantee." *Packer v.
Bird*, 137 U. S. 661. In this state it has been repeatedly
held that the riparian proprietor upon navigable lakes and
ponds takes title of the land only to the water's edge.
*Delaplaine v. C. & N. W. R. Co.* 42 Wis. 214; *Boorman v.
Sunnuchs*, 42 Wis. 233; *Diedrich v. N. W. U. R. Co.* 42 Wis.
248; *Priewe v. Wis. State L. & I. Co.* 93 Wis. 546; *Ne-pee-nauk
Club v. Wilson*, 96 Wis. 290.

The facts in the case at bar, as to the extent and depth of
the waters on the premises in question, prior to the construc-
tion of the Farwell dam, are much more favorable for re-
garding the same as a portion of the lake than in the case
last cited. Obviously, in so far as the patent covered such
portions of the lake, it was issued by mistake or without au-
thority, and hence was inoperative and void, although it
may have been valid in so far as it covered dry land. *Lam-
prey v. State*, 52 Minn. 181. But, even if the patent is only
voidable by other and appropriate proceedings, still it is not
available to the plaintiff, under the facts found in this case,
for reasons already stated. Since the title to all portions of
the lake has at all times been either in the United States or
the state of Wisconsin, it follows that it has at all times been
exempt from taxation. R. S. 1878, and Stats. 1898, sec. 1038,
subd. 1. The tax deed to Tredway, therefore, assuming that
it was not void for uncertainty, yet, in so far as it covers, or

purports to cover, portions of the lake, must be regarded as un-authorized, contrary to the statute, and hence void, although, in so far as it covers dry land, the same may be valid; and this applies to the condition of the waters on the premises in question at the time of the commencement of this action, forty-seven years after the construction of the Farwell dam. That dam was a permanent structure, designed to be such, and has so remained for nearly half a century. There is no claim that it was an unlawful structure. Although an artificial structure, which considerably increased the depth, the extent, and breadth of the waters on the premises in question, yet the public had the right to navigate such waters after they were so increased in volume, the same as though they had always remained in that condition. *Whisler v. Wilkinson,* 22 Wis. 572; *Volk v. Eldred,* 23 Wis. 410; *Weatherby v. Meiklejohn,* 56 Wis. 73; *Smith v. Youmans,* 96 Wis. 103, and cases cited by Mr. Justice Pinney on page 110. Certainly, persons navigating the lake cannot be required or expected to carry with them a chart and compass and measuring lines, to determine whether they are at all times within what were the limits of the lake prior to the construction of the dam.

The question as to whether a riparian owner may rightfully fill in or build out to navigable water, suggested by counsel, is not here involved.

As to the Catfish creek, the federal statute, as it has existed for more than a century, declares that "all navigable rivers, within the territory occupied by the public lands, shall remain and be deemed public highways; and, in all cases where the opposite banks of any streams not navigable belong to different persons, the stream and the bed thereof shall become common to both." R. S. of U. S. sec. 2476; *Shively v. Bowlby,* 152 U. S. 32, 33. The federal statutes, regarding the duties of surveyors of public lands, cited, apply to such navigable streams. It is conceded that the

portion of the Catfish in question is a navigable stream. *Willow River Club v. Wade*, 100 Wis. 86. What has been said about the raising of the waters of the portions of the lake in question applies equally to the raising of the water and broadening and deepening of the channel of Catfish creek. This opinion is not to be construed as giving any right to trespass upon any lands of the plaintiff or other private owner.

We must hold that the defendants, by going upon the waters in question with their boats, as found by the court, did not trespass upon the lands of the plaintiff.

*By the Court.*— The judgment of the circuit court is affirmed.