[File No. 6354.]

C. N. GARDNER, Respondent, v. FRANK GREEN and H. M. Mason.

FRANK GREEN, Appellant.

(271 N. W. 775.)

Opinion filed February 25, 1937.

R. E. Swendseid, for appellant.

C. N. Cottingham, for respondent.

CHRISTIANSON, Ch. J.    This is an action to determine adverse claims to certain lands lying between the meander line, placed by the United States government survey in front of lots 5 and 7 in section 27, township 153 N., range 93 W., in McKenzie county, North Dakota, and the Missouri river which flows in front of and immediately adjacent to such lands.    Lots 5 and 7 were surveyed by the United States government in 1896.    The survey of the subdivisions and meanders were made in June and July, 1896, and the official map conformable to the field notes of the survey was approved and filed in the United States Surveyor General's office in January, 1897.    The United States issued patent for lot 5 on June 1, 1911 and for lot 7

on October 12, 1920. The plaintiff is the owner of lot 5 and the defendant, Green, is the owner of lot 7.

There is no dispute as to the rule that should be applied in dividing accretions between the owners of the two tracts; but there is a dispute as to the base or starting point from which a line should be drawn dividing such accretions.

The questions raised on this appeal are: (1) Should the meander line shown on the map of the United States Survey be taken as the boundary line of lots 5 and 7, and should the point where the subdivision line running east and west between lots 5 and 7 intersects such meander line be taken as the starting point for the purpose of dividing accretions between the owners of the two tracts? (2) If not, was the meander line in fact also the actual shore line in front of the lots in question at the time of the government survey?

The case was tried to the court without a jury and resulted in a judgment in favor of the plaintiff. The defendant Green has appealed, demanding a trial anew in this court.

Upon the trial copies of the field notes and of the official map of the United States survey were offered and received in evidence. There was also adduced testimony of witnesses as regards the condition of the land where the meander line was run and the existence and the condition of land between the meander line and the shore of the river. Such evidence related to the character of the land, growth of trees, etc. Some of the witnesses had been familiar with and had observed the condition of the land over a long period of years.

The following map is a reproduction of the original plat of the government survey in 1896:

The trial court, among others, made the following findings of fact:

5. "That in making said survey said United States Surveyor General caused a meander line to be established along the sides of said Lots 5 and 7 facing said Missouri River toward the East, the North end of said meander line where it angles away from the actual river shore line being established on the river edge, and can be located as follows, to-wit: Commencing at a point about 2112 feet due East of the Southwest corner of Lot 5 in Section 27, Township 153 N., Range 93 W., 5th P. M. on the line extending East and West between Lots 5 and 7 in said Section 27, thence running due North a distance of about 2112 feet to the meander line on the bank of the Missouri River. That from said point said meander line runs diagonally in a southeasterly direction along the East frontage of said Lots 5 and 7 to a point on said meander line 990 feet due East of the Northeast Corner of the Southeast Quarter of the Southwest Quarter (SE$\frac{1}{4}$ SW$\frac{1}{4}$) of Section 27 in said Township and Range.

6. "The said meander line in front of Lots 5 and 7 as above described does not follow the actual shore line of said Missouri River; but in fact runs a considerable distance West of said actual shore line of said river as it existed in the year 1897, and as it exists at the present time, to-wit: That from the North point on said meander line as above described, the actual shore line of said Missouri River, at the time of said survey, extended in a general southeasterly direction East therefrom, said actual shore line being in the year 1897 located a distance of approximately 3240 feet due East from the point on the meander line located at the Northeast corner of said Lot 7 in Section 27, and that at the present time the actual shore line of said Missouri River is located at a distance of approximately 3540 feet due East of said Northeast corner of Lot 7 in Section 27.

7. "That subsequent to the year 1897 there has been added to the frontage of said Lots 5 and 7, in the nature of accretion thereto territory as follows: on the quarter section line running East and West between Lots 5 and 7, Section 27, the shore line is now situated about 300 feet due East of the old shore line as it existed in 1897.

8. "That the tract of land lying between the meander line above described and in front of said Lots 5 and 7, and the old shore line of

the Missouri River as it existed in 1897 is covered with dense underbrush and small cottonwood trees."

The laws of the United States prescribe the following rules for ascertaining the boundaries of public lands that have been surveyed by the Surveyor General:

"The boundaries and contents of the several sections, half-sections, and quarter-sections of the public lands shall be ascertained in conformity with the following principles:

"First. All the corners marked in the surveys, returned by the surveyor-general, shall be established as the proper corners of sections, or subdivisions of sections, which they were intended to designate; and the corners of half and quarter sections, not marked on the surveys, shall be placed as nearly as possible equidistant from two corners which stand on the same line.

"Second. The boundary-lines, actually run and marked in the surveys returned by the surveyor-general, shall be established as the proper boundary-line of the sections, or subdivisions, for which they were intended, and the length of such lines, as returned, shall be held and considered as the true length thereof. And the boundary-lines which have not been actually run and marked shall be ascertained, by running straight lines from the established corners to the opposite corresponding corners; but in those portions of the fractional townships where no such opposite corresponding corners have been or can be fixed, the boundary-lines shall be ascertained by running from the established corners due north and south or east and west lines, as the case may be, to the watercourse, Indian boundary-line, or other external boundary of such fractional township. . . ." 2 Stat. at L. 313, chap. 14, Rev. Stat. § 2396, 43 U. S. C. A. § 752.

"In every case of the division of a quarter-section the line for the division thereof shall run north and south, and the corners and contents of half quarter-sections which may thereafter be sold, shall be ascertained in the manner and on the principles directed and prescribed by the section preceding, and fractional sections containing one hundred and sixty acres or upwards shall in like manner as nearly as practicable be subdivided into half quarter-sections, under such rules and regulations as may be prescribed by the Secretary of the

Interior, and in every case of a division of a half quarter-section, the line for the division thereof shall run east and west, and the corners and contents of quarter quarter-sections, which may thereafter be sold, shall be ascertained as nearly as may be, in the manner, and on the principles, directed and prescribed by the section preceding; and fractional sections containing fewer or more than one hundred and sixty acres shall in like manner, as nearly as may be practicable, be subdivided into quarter quarter-sections, under such rules and regulations as may be prescribed by the Secretary of the Interior." (3 Stat. at L. 566, chap. 51, 4 Stat. at L. 503, chap. 65, Rev. Stat. § 2397, 43 U. S. C. A. § 753.)

The meaning and effect of these provisions were considered by the Supreme Court of the United States in St. Paul & P. R. Co. v. Schurmeier, 7 Wall. 272, 19 L. ed. 74; and Jefferis v. East Omaha Land Co. 134 U. S. 178, 33 L. ed. 872, 10 S. Ct. 518.

In St. Paul & P. R. Co. v. Schurmeier, the plaintiff claimed title to lots in a block in St. Paul, Minnesota, under a patent from the United States of a fractional section, bounded on one side by the Mississippi river. At the place in question, there was a small island, lying along the shore of the river, about four feet lower than the main land, and separated from it by a channel or slough twenty-eight feet wide, in which at very low water there was no current, and very little water, and that standing in pools; at a medium stage of the water the island was not covered, and there was a current or flow through the channel or slough; and at very high water the island was submerged. In the original government survey, the meander lines were run along the main land of the shore, the quantity of land was estimated accordingly, and the island and intervening space were not shown or mentioned. That island and space were afterwards filled up by the city as a landing place, and were claimed by the railroad company under a subsequent survey and grant from the United States. The island, therefore, was connected with the main land by a space substantially uncovered at low water; and the improvements complained of did not extend beyond high water mark of the island. The question in controversy was whether the plaintiff's patent was limited by the main shore, or extended to the outside of the island.. The supreme court

of Minnesota held that, by the law of Minnesota, land bounded by a navigable river extended to low water mark, at least, if not to the thread of the river; and that the plaintiff's title therefore extended to the water's edge at low water mark and included the island, and gave judgment for the plaintiff. 10 Minn. 82, Gil. 59, 88 Am. Dec. 59.

The Supreme Court of the United States affirmed the judgment, saying:

"Express decision of the supreme court of the state was, that the river, in this case, and not the meander line, is the west boundary of the lot, and in that conclusion of the state court we entirely concur. Meander lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream, and as the means of ascertaining the quantity of land in the fraction subject to sale, and which is to be paid for by the purchaser. In preparing the official plat from the field notes, the meander line is represented as the border line of the stream, and shows, to a demonstration, that the water course, and not the meander line as actually run on the land, is the boundary." 7 Wall. 286, 287, 19 L. ed. 78. And the court treated it as too plain for discussion, that the island, separated from the main land only by a depression in which at low water there was no continuous flow or line of water, was included in the first survey, and therefore, not affected by the subsequent survey. 7 Wall. 288, 289, 19 L. ed. 78.

In Jefferis v. East Omaha Land Co. supra, there was involved a fractional subdivision of public land adjacent to the Missouri river and the controversy involved accretions between the meander line and the river. The land involved in that action was designated as lot 4 in fractional section 21, township 75 N., range 144 W., of the Fifth Principal Meridian containing 37.24 acres according to the official plat of the survey of said land returned to the general land office by the surveyor general. The court, in its opinion in that case (after referring to the description of the land as set forth in the patent, and stating that a copy of the official plat showed the Missouri river as the north boundary of said lot and that the lot is marked on the plat as containing 37.24 acres)—said:

"It is a familiar rule of law that, where a plat is referred to in a

deed as containing a description of land, the courses, distances and other particulars appearing upon the plat are to be as much regarded, in ascertaining the true description of the land and the intent of the parties, as if they had been expressly enumerated in the deed. Fox v. Union Sugar Refinery, 109 Mass. 292. This rule is applicable to government lands bounded by the Missouri River, as the same are surveyed and platted under the Acts of Congress; and the patent passed the title of the United States to lot 4, not only as it was at the time of the survey in 1851, but as it was at the date of the patent in 1855, so that the United States did not retain any interest in any accretion formed between the survey in 1851 and the date of the patent.

"No different rule is established by the Acts of Congress which provide for the survey and sale of the public lands. The provisions found in §§ 2395 et seq. of the Revised Statutes, in regard to the survey of the public lands, are re-enactments of Statutes passed in 1796, 1800, 1805, 1820 and 1832. *According to these provisions, section 21 being a fractional section, because the river cut through it on its north side, the east and west side lines of lot 4 were to be run north to the river.* No provision was made for running the north boundary line of lot 4, but the river formed such north boundary without the running of any line there. . . .

"In the present case, the plat was made in accordance with the Statute, showing the river as the northern boundary of fractional section 21 and of lot 4 therein; and as the patent referred to the official plat of the survey, and thus made that a part of the description of lot 4, that description made the river the boundary of lot 4 on the north."

In Hardin v. Jordan, 140 U. S. 371, 35 L. ed. 428, 11 S. Ct. 808, 838, it is said:

"The meander lines run along or near the margin of such waters are run for the purpose of ascertaining the exact quantity of the upland to be charged for, and not for the purpose of limiting the title of the grantee to such meander lines. It has frequently been held, both by the Federal and State Courts, that such meander lines are intended for the purpose of bounding and abutting the lands granted upon the waters whose margins are thus meandered; and that the waters themselves constitute the real boundary."

The laws of North Dakota provide:

"Except when the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on a navigable lake or stream, takes to the edge of the lake or stream at low water mark, and all navigable rivers shall remain and be deemed public highways. In all cases when the opposite banks of any stream not navigable belong to different persons the stream and the bed thereof shall become common to both." Comp. Laws 1913, § 5352.

"When from natural causes land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any existing right of way over the bank." Comp. Laws 1913, § 5473.

It is apparent that under these statutes there is no reservation in the state of title to accretions on navigable rivers.

This court has recognized and applied the rule that in this state the body of the water and not the meander line is the true boundary of public lands conveyed by patent of the United States government. Heald v. Yumisko, 7 N. D. 422, 75 N. W. 806; Brignall v. Hannah, 34 N. D. 174, 157 N. W. 1042. The rule is stated thus in ¶ 4 of the syllabus in Heald v. Yumisko, supra:

"When an irregular tract or lot of land abuts upon a stream of water, and a meander line is run ostensibly along this shore line for the purpose of fixing the area of such tract, the real boundary of the tract is the shore line, and not the meander line." (¶ 4, Syllabus.)

Gould on Waters, 2d ed. § 76 says:

"According to all the decisions in those States in which the lands were originally surveyed under the laws of the United States, the lines run by the United States surveyors along the river banks are not lines of boundary, the owners of the adjacent lands taking at least to the water's edge, thus giving them the benefit of the river frontage, with the right of access to the river, and the incidents of riparian proprietorship as to the use of the water. . . . When land owners once become riparian proprietors, they are entitled to the accretions, or newly-formed ground which may be left by the river after the survey and sale by the United States of the adjacent land, and which, if not their property, would separate them from the river."

The appellant in this case does not claim that the meander line shown on the map of the United States survey is the boundary of the grants; and if such meander line were the boundary line of lots 5 and 7 there would be no reason for this action as neither of the parties would have any interest in the land in controversy. The appellant does contend, however, that for the purpose of dividing accretions the meander line shown on the map of the United States survey must be accepted as the shore line, and that any lands that may have existed beyond the meander line at the time the survey was made must be treated as accretions. In other words, the appellant contends that for the purpose of dividing any land that may have been in existence between the meander line and the shore of the river at the time the survey was made, as well as any accretions formed subsequent to the survey, the meander line must be accepted as the "shoreline" of the river.

No decision has been called to our attention (and none has been found) sustaining the rule contended for by appellant; and the Supreme Courts of Illinois and Wisconsin have held to the contrary. Peoria v. Central Nat. Bank, 224 Ill. 43, 79 N. E. 296, 12 L.R.A. (N.S.) 687; Menasha Wooden Ware Co. v. Lawson, 70 Wis. 600, 36 N. W. 412.

In Peoria v. Central Nat. Bank, supra, the controversy involved a strip of land between the meander line of the Illinois river and the bank or shore line of the river. In the opinion in that case the court said:

"The chief controversy in this record concerns the location of the point which marks the southerly end of the section line between said fractional sections 9 and 10; counsel for appellant contending that the section line ends at the meander line running along the bank of the Illinois river, while counsel for appellee insist that it continues to the center thread of the Illinois river, or at least to the water line.

"The rule is settled that meander lines are not intended as boundaries, but that the body of water will be regarded as the true boundary. Farnham, Waters, § 418. According to the decisions in most of the states in which lands were surveyed under the United States laws, the lines run by the surveyors along the river banks are not lines of boundary, the owners of the adjacent lands taking at least to the

water's edge, thus giving them the benefit of river frontage, with the right of access to the river and the incidents of riparian proprietorship as to the use of the water. Gould, Waters, 3d ed. § 76. The meander line, which is run for the purpose of ascertaining the amount of land in a fractional section, cannot be regarded as a boundary line. . . .

" 'Meander lines are run in surveying fractional portions of the public lands bordering upon navigable rivers, not as boundaries of the tract, but for the purpose of defining the sinuosities of the banks of the stream and as the means of ascertaining the quantity of the land in the fraction subject to sale, and which is to be paid for by the purchaser.' . . .

"Counsel for appellant admit this to be the correct rule in this state, but insist that the meander line should be taken as the starting point or shore line from which to draw lines to the center thread of the river to show the water rights between the various property owners fronting on the river and for the purpose of dividing accretions, if any, among the property owners. No decision has been called to the attention of the court where such ruling has been made."

The court found as a fact that at the time the fractional sections were sold by the government there was a strip of land from 150 feet to 270 feet in width between the meander line and the shore line of the river; that "the original shore line at the time the land was patented was as far out as the present dock line." And the court announced the rule that the section lines of the government survey of a fractional portion of public land bordering on a river did not stop at the meander line, but maintain their course to the water's edge; and held that land lying between the meander line and the shore line at the time the fractional portion was laid out and patented was a part of the fractional portion and was included in the land conveyed by the patent for the fractional portion. 224 Ill. 43, 79 N. E. 296, 12 L.R.A.(N.S.) 687.

In government surveys of public lands, at least in this and other western states, fractional divisions made so by water are designated and sold by the numbers attached thereto, and reference is always had to the notes and maps of the survey. Horne v. Smith, 159 U. S. 42, 40 L. ed. 68, 69, 15 S. Ct. 988. Thus in accordance with the official

regulations of the general land office the patents conveying lots 5 and 7 described the lands respectively as lots 5 and 7 "according to the official plat of the survey of said land, returned to the general land office by the surveyor general." In the absence of showing to the contrary it will, of course, be presumed that the meander line is also the shore line; and a person who claims that at the time of the survey there were lands between the meander line and the shore line has the burden of establishing that fact. But, as shown by the authorities above cited, the owner of lands affected may show that the meander line established by a government survey did not in fact follow the shore line and that the boundaries of the tract as fixed by the shore line included lands between the meander line and the shore line.

In this case the trial court found that at the time the government survey was made the meander line did not follow the shore line but that there was a strip of land between the meander line as shown on the map of the survey and the shore line. These findings are in accord with the evidence. In fact, the official plat of the government survey in this case shows that the meander line did not actually follow the shore line and that there was a strip of land of some sort between the meander line and the shore line of the river.

It is the contention of the appellant, however, that even though the meander line shown upon the map of the government survey be not accepted as the starting point for the purpose of dividing any land that may have been in existence between such meander line and the shore of the river at the time of the survey, and even though the line of survey between lots 5 and 7 be extended eastward beyond the meander line, that such line of survey can be extended only until it reaches the next governmental subdivision line; and it is asserted that in this case the line running east and west between said lots 5 and 7 should in any event be extended only to the next forty line or one-fourth of a mile easterly from the northwest corner of lot 7. In support of this contention appellant cites certain decisions rendered by the Supreme Court of Wisconsin which in a general way announced the rule that when a fractional subdivision of public land, according to the government survey, is bounded on one side by a body of water and on the other sides by government subdivision lines, the body of water and not the meander line is the boundary and the government subdivision lines

will be extended until they reach the water unless before reaching the water they intersect a government subdivision line, that is, a section line, a quarter line or a forty line; but that if such government subdivision lines so extended beyond the meander line intersect a government subdivision line before reaching the water front that then such line and not the water front constitutes the boundary. Whitney v. Detroit Lumber Co. 78 Wis. 240, 47 N. W. 425; Lally v. Rossman, 82 Wis. 147, 149, 51 N. W. 1132; Mendota Club v. Anderson, 101 Wis. 479, 490, 78 N. W. 185; Wisconsin Realty Co. v. Lull, 177 Wis. 53, 62, 187 N. W. 978.

The rule announced by the Supreme Court of Wisconsin in these cases was subsequently amplified and to some extent qualified in Blatchford v. Voss, 197 Wis. 461, 468, 219 N. W. 100, 222 N. W. 804. In its decision in that case the Wisconsin court reconsidered its holding in the former cases and held "that an intercepting government subdivision line" is not, "in and of itself, a complete bar to further search for an actual water boundary" in all cases; "that such an intercepting governmental subdivision line is not to be deemed an absolute and controlling feature, but one only of the many that may be properly considered" in determining the boundary; that "the primary consideration is to ascertain as far as . . . possible, what should be deemed was the intention or purpose in the original government survey and chamber platting of the property bordering on any particular body of water." 197 Wis. 468, 469.

We are of the opinion that the rule announced by the Supreme Court of Wisconsin in Blatchford v. Voss, supra, is correct; and when that rule is applied to the facts in this case it necessarily follows that the survey line between lots 5 and 7 does not terminate at a point where it would be intersected by a forty line running north and south one-fourth mile east of the west boundary of lot 7; but such survey line extends to the shore line of the river unless before reaching the river it intersected the section line running north and south between sections 26 and 27.

In this case the official plat of the government survey demonstrates that there was no intention that the line of survey between lots 5 and 7 should extend only until that line was intersected by a line running north and south at a point beginning one-fourth of a mile east of the

northwest corner of lot 7. The field notes and the official plat of the government survey disclose that there were no other lands "surveyed or conveyed by the United States which, even by the projection of their lines" to the shore line of the river could "interfere with the projection" of the line between lots 5 and 7. Brown v. Dunn, 135 Wis. 374, 378, 115 N. W. 1097, 1098.

According to the field notes and the government map, lot 7 is bounded on the north, west and south sides by government subdivision lines and it is bounded on the east side either by the Missouri river or by the section line running north and south between sections 26 and 27. The field notes and the map of the survey disclose that the surveyors included in lot 7 land lying east of a point one-fourth mile east of the western boundary of lot 7 "thus conclusively refuting the inference that the government intended" that the government subdivision lines forming the south and north boundaries of lot 7 should extend only until such lines reached a point where they would intersect a forty line running north and south one-fourth of a mile east of the government subdivision line which forms the west boundary of said lot 7. Brown v. Dunn, 135 Wis. 374, 378, 115 N. W. 1097, 1098. The official map of the survey clearly shows that in extending the "meandered boundary line" on the east side of lot 7 "to the actual edge of the water" as shown on such map "there was no crossing of any other subdividing lines indicated on the original survey, and involved no infringement on any thereon indicated possible rights of others." Blatchford v. Voss, supra.

We are agreed that at the time lots 5 and 7 were surveyed and patented there was no intention that the meander line shown on the map of the government survey should constitute a boundary; or that the survey line between these two lots should stop at the meander line; or that it should stop at a point one-fourth mile east of the northwest corner of lot 7. We are of the opinion that it was the intention that such survey line should be projected to the shore line of the river unless before reaching such shore line it intersected the section line running north and south between sections 26 and 27. If the shore line of the river was on the east side of such section line then lot 7 was not bounded by the river but the section line constituted its eastern boundary and no question of accretions would be involved. If, on the other

hand, the shore line of the river was on the west side of such section line then the shore line constituted the eastern boundary of lot 7 and the survey line between lots 5 and 7 was intended to be projected to the then shore line of the river; and the base or starting point for dividing any accretions formed subsequent to the time lots 5 and 7 were laid out would be the point where the survey line between lots 5 and 7 projected eastward intersected the shore line of the river at the time the lots were laid out in accordance with the United States government survey.

But the survey line between lots 5 and 7 is not to be projected for the purpose of dividing accretions, that is, land that came into existence after the lots were laid out. Kehr v. Snyder, 114 Ill. 313–317, 2 N. E. 68, 55 Am. Rep. 866. It is to be projected only for the purpose of establishing the boundaries of the tracts as they were laid out, and to divide land then in existence between the meander line, as shown on the plat, and the shore line of the river. Land formed subsequent to the time the lots were laid out must be apportioned among the owners of lands fronting on the river in accordance with the rules applicable to the apportionment of accretions.

It is asserted by the appellant that a projection of the subdivision line between lots 5 and 7 eastward beyond the meander line will deprive owners of other adjacent tracts of access to the river. It is not possible or proper in this case to attempt to determine the rights of owners of tracts of land other than those involved in this action; but obviously no owner of a tract that actually bordered on and was bounded by the river can or will be denied access to the river, for the same rules for establishing boundaries, and apportioning accretions, are applicable to all lands similarly situated.

The fundamental theory underlying the ownership of accretions is that each of the several riparian owners shall have a frontage on the new shore proportionate to his frontage on the old one, connecting their respective points by straight lines. A common principle which pervades all modes of division is that no regard is paid to the direction of the side lines between contiguous owners, but the reference is solely to the shore line. 1 R. C. L. p. 244.

The main objects to be kept in view in any division of accretions is that the division shall be equitable and that it shall be proportional

so as to give each shore owner a fair share of the land to be divided and his due portion of the new shore line proportionate to his share on the original line of the water. 3 Farnham, Waters, p. 2475.

It is not necessary or proper to determine here whether if a case should arise where the application of the general rule for the apportionment of accretions would result in such inequality as to make it inequitable, such rule should be modified; for that situation is not presented here.

It will be noted that finding of fact number five (above quoted) purports to state the location of the meander line established by the United States government survey. The finding reads in part: "The North end of said meander line where it angles away from the actual river shore line being established on the river edge, . . . can be located as follows, to-wit: Commencing at a point about 2112 feet due East of the Southwest corner of Lot 5 in Section 27, Township 153, N., Range 93 W., 5th P. M. on the line extending East and West between Lots 5 and 7 in said section 27, thence running due North a distance of about 2112 feet to the meander line on the bank of the Missouri River." This finding is clearly erroneous. The point thus designated is not on the meander line established by the government survey at all but is a long distance north of such line.

Finding of fact number six (quoted above) in so far as it states that "the said meander line in front of lots 5 and 7 . . . does not follow the actual shore line of said Missouri River; but in fact runs a considerable distance west of said actual shore line of said river as it existed in the year 1897 and as it exists at the present time" is in accord with the evidence and in accord with the official plat of the government survey and the field notes. But we have grave doubts as to the correctness of that portion of finding number six wherein it is found that the "actual shore line" was "in the year 1897 located a distance of approximately 3240 feet due east from the point on the meander line located at the northeast corner of said lot 7 in section 27," and we are not prepared either to approve it or disapprove it; and have reached the conclusion that the parties should be afforded an opportunity to introduce further evidence on the question covered thereby. If this finding is correct, then at the time of the government survey the west shore of the Missouri river was on the east side of

the section line running north and south between sections 26 and 27, and lot 7 was not bounded by the river at all but was bounded on the east by such section line.

In the circumstances it is not possible for us to render final judgment. We are agreed:

(1) That the meander line that was run east of lots 5 and 7 at the time of the government survey in 1896 did not constitute the boundary of such lots; that such meander line was run for the purpose of defining the sinuosities of the stream and as the means of ascertaining the quantity of land in each lot subject to sale and to be paid for by the purchaser.

(2) That the trial court was correct in finding that at the time of the survey there existed a quantity of land between the meander line and the actual shore line of the river, but that the record on this appeal is such as to leave us in doubt as to the exact distance east of the meander line where the subdivision line between lots 5 and 7 projected eastward did in fact intersect the actual shore line of the river, and, accordingly, the parties to this action will be afforded an opportunity to submit additional testimony on the question as to the location of the shore line.

(3) That at the time of the survey and at the time lots 5 and 7 were patented said lots were bounded on the east either by the Missouri river or by the section line running north and south between sections 26 and 27 and that the governmental subdivision line between lots 5 and 7 did not stop at the point where such survey line intersected the meander line shown on the map of the United States government survey but was projected eastward to a point where such survey line intersected the west shore of the Missouri River unless before reaching the river it intersected the section line running north and south between sections 26 and 27, in which case the section line formed the eastern boundary of lots 5 and 7 at the point of such intersection.

The cause is remanded for a new trial on the question as to the location of the shore line at the time of the survey.

BURKE, NUESSLE, MORRIS and BURR, JJ., concur.