KIM–GO, H.K. Minerals, Inc., a North Dakota corporation, R.N. Erickson, Nora S. Erickson, Mildred Erickson, Alice Langsdorf, Ruth Bovee, Mary A. Olson, Gladys Monson, E.W. Erickson, James G. Erickson, Wayne Dobie, individually and as guardian for Steven Dobie and Joseph Dobie, Jr., William K. Erickson, and Steven Jay Erickson, Plaintiffs and Appellees,

v.

J.P. FURLONG ENTERPRISES, INC., a North Dakota corporation; Nantasket Petroleum Corporation, a Colorado corporation; David A. Papineau and Catherine Mary Papineau, Defendants and Appellants,

Sun Exploration and Production Company, a corporation; State of North Dakota; Grace M. Oyloe; Orville Oyloe; Ladd Petroleum Corporation; a corporation; R.E. Puckett; and Bruce P. Alfson, Defendants.

Civ. No. 900002.

Supreme Court of North Dakota.

Sept. 5, 1990.

Winkjer, McKennett, Stenehjem, Murphy & Reierson, Williston, for plaintiffs and appellees; argued by Richard A. McKennett.

Owen L. Anderson (argued), Texas Tech University School of Law, Lubbock, Tex., and Fred C. Rathert (appearance), of Bjella, Neff, Rathert, Wahl & Eiken, P.C., Williston, N.D., for defendants and appellants.

LEVINE, Justice.

In *J.P. Furlong Enterprises, Inc. v. Sun Exploration and Production Co.*, 423 N.W.2d 130 (N.D.1988) [*Furlong I*], we held that Section 47–06–07, N.D.C.C., applies to determine ownership of oil and gas interests underlying an abandoned riverbed. This case presents the question whether, under Section 47–06–07, N.D.C.C.,

parties who lose separately owned tracts of land as a result of a river abandoning its old bed and forming a new bed acquire ownership of the old bed in severalty or on an undivided basis. The trial court decided that ownership was on an undivided basis. We reverse and remand for proceedings consistent with this opinion.

In 1957, the Missouri River followed an oxbow course through portions of Sections 3, 4, 9, 10, 11, 14, 15 and 16, in Township 152, Range 103, McKenzie County. The United States of America acquired land by eminent domain in Sections 14 and 15 in the neck of the oxbow and diverted the river through a trench in the neck of the oxbow, leaving a long oxbow of abandoned riverbed north of the new channel. The west end of the new riverbed is on land which was owned by the Papineaus, and the east end of the new riverbed is on land which was owned by the Ericksons.[1] From 1982 to 1985, five producing oil and gas wells were drilled on tracts which included parts of the west end of the abandoned riverbed. No producing oil and gas wells have been drilled affecting the east end of the abandoned riverbed.

After our decision in *Furlong I*, the plaintiffs[2] brought this quiet title action, seeking a determination that the parties who lost separately owned land under the new riverbed were entitled to an undivided interest in the abandoned riverbed in proportion to their former ownership of the new riverbed. The defendants answered, seeking ownership of the abandoned riverbed in severalty. Alternatively, the defendants counterclaimed for contribution for the value of work, labor, and materials expended in proving and preserving the plaintiffs' interest in the property in *Furlong I*.

The trial court granted partial summary judgment in favor of the plaintiffs, concluding that "in interpreting Section 47–06–07, N.D.C.C., and in applying principles of justice and equity ... the subject abandoned riverbed be awarded to Plaintiffs and Defendants in proportion to the acres that each lost under the new river channel and that the parties be awarded the land and minerals on an undivided basis in proportion to acres lost." The trial court severed the defendants' counterclaim and also entered a Rule 54(b) certification on the issue of whether ownership of the abandoned riverbed should be undivided or several.[3]

Section 47–06–07, N.D.C.C., provides:

*"Ancient stream bed taken by owners of new course as indemnity.—If a stream, navigable or not navigable, forms a new course abandoning its ancient bed, the owners of the land newly occupied take by way of indemnity the ancient bed abandoned, each in proportion to the land of which he has been deprived."*

The defendants claim ownership of the abandoned riverbed in severalty because they say that result is intended by Section 47–06–07, N.D.C.C., and is consistent with analogous principles of riparian law and other well-settled principles of property law, as well as being good public policy. The plaintiffs respond that accretion principles and riparian land rights are not applicable and that the trial court correctly determined that they should be indemnified under "principles of justice and equity," with undivided ownership of the abandoned riverbed. We agree with the defendants' position.

1. The State became the owner of the new riverbed. *See* Sections 47–01–14 and 47–01–15, N.D.C.C.; *J.P. Furlong Enterprises, Inc. v. Sun Exploration and Production Co.,* 423 N.W.2d 130 (N.D.1988) *[Furlong I]*.

2. All of the named parties in this action claim oil and gas interests in the abandoned riverbed as a result of leases or other assignments made by the Ericksons or Papineaus. Plaintiff Kim-Go H.K. Minerals, Inc., leases oil and gas interests in the abandoned riverbed from the remaining plaintiffs. Defendants J.P. Furlong Enter-

prises and Nantasket Petroleum Corporation lease oil and gas interests in the abandoned riverbed from David Papineau. Defendant Sun Exploration and Production Company is the operator of the five oil wells which are on spacing units in the west end of the abandoned riverbed.

3. Certification under Rule 54(b), N.D.R.Civ.P., is not necessary for claims that are severed under Rule 21, N.D.R.Civ.P. *Federal Land Bank of St. Paul v. Wallace,* 366 N.W.2d 444 (N.D.1985).

The interpretation of a statute is a question of law, fully reviewable by this court. *Ladish Malting Co. v. Stutsman County, Etc.*, 351 N.W.2d 712 (N.D.1984). The primary purpose of statutory construction is to ascertain the intent of the Legislature. *E.g., County of Stutsman v. State Historical Society,* 371 N.W.2d 321 (N.D. 1985). The Legislature's intent initially must be sought from the language of a statute. *Id.* Unless words in a statute are defined in the code, they are to be given their plain, ordinary, and commonly understood meaning. Sections 1–02–02, 1–02–03, N.D.C.C.; *County of Stutsman v. State Historical Society, supra.* If the language of a statute is ambiguous or of doubtful meaning, extrinsic aids may be used to interpret the statute. *Id.*

Section 47–06–07, N.D.C.C., describes *who* owns an abandoned riverbed when a river abandons its ancient bed and forms a new course, i.e., the former owners of the new riverbed. It also provides that the new owners take the old riverbed "by way of indemnity ... in proportion to land" lost to the new riverbed. Section 22–02–01, N.D.C.C., defines "indemnity" as "a contract by which one engages to save another from a legal consequence of the conduct of one of the parties or of some other person." Webster's New World Dictionary, Second College Edition, defines "proportion" as the "comparative relation between parts, things or elements with respect to size, amount, degree." These definitions indicate that the intent of the statute is to compensate former owners of the new riverbed for loss by bestowing upon them ownership of the abandoned bed in a quantity proportionate to their former ownership. The purpose of that indemnity is to restore the parties to their former positions as closely as possible. However, these definitions do not clearly resolve whether the former owners of separate interests in the new riverbed take the abandoned riverbed in severalty or on an undivided basis. Section 47–06–07, N.D.C.C., is therefore ambiguous and of doubtful meaning in this respect, and we may look to extrinsic aids to ascertain the intent of the Legislature.

Extrinsic aids which may be used to determine legislative intent include the laws upon the same or similar subjects and the consequences of a particular construction. Section 1–02–39, N.D.C.C.

We have found no case from any jurisdiction which has created undivided interests in comparable circumstances. Instead, we note and rely on the general rule in real property law that favors divided interests over undivided interests. The preference for divided interests is demonstrated in cases involving the rights of riparian landowners and the consequences of accretion, erosion, avulsion, and reliction.[4] Those cases lead us to conclude that Section 47–06–07, N.D.C.C., authorizes ownership of the abandoned riverbed in severalty if former ownership of the land under the new bed was several.

In *Amoco Oil Co. v. State Highway Dept.*, 262 N.W.2d 726, 728 (N.D.1978), we construed language of Section 47–01–15, N.D.C.C.,[5] that says when the opposite

---

**4.** In *Furlong I, supra,* 423 N.W.2d at 133, n. 4, we defined the following terms:

"'Accretion' refers to the gradual deposit and addition of soil along the bank of a waterbody caused by the gradual shift of the waterbody away from the accreting bank.

"'Erosion' refers to the gradual loss of soil along the bank of a waterbody caused by the gradual encroachment of water into the eroding bank.

"'Avulsion' refers to the sudden inundation or sweeping away of land resulting from a sudden change in the course of a waterbody.

"Technically, 'reliction' refers to the sudden baring of land resulting from a sudden change in the course of a waterbody. However, the word 'reliction' is also commonly used to describe the gradual receding of water resulting in the gradual baring of previously submerged land."

*See generally* Beck, The Wandering Missouri River: A Study in Accretion Law, 43 N.D.L.Rev. 429, 431 (1967).

For an historical discussion of riparian rights and the consequences of accretion, erosion, avulsion, and reliction, *see Furlong I.*

**5.** Section 47–01–15, N.D.C.C., provides:

"*Banks and beds of streams—Boundary of ownership.*— Except when the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on a navigable lake or stream, takes to the edge of the lake or stream at low water-

banks of land adjacent to nonnavigable streams belong to different persons, the stream and bed "shall become common to both":

"Although our court has apparently never decided whether the word 'common' means that two opposite shore owners will own the bed as tenants in common, or whether each shall own a part of the bed, we conclude, now, as the United States Supreme Court has previously concluded in construing similar language of the Federal statute, that each riparian owner owns to the center of a nonnavigable stream, the 'center' being synonymous with 'thread'.[1]

\* \* \* \* \* \*

"[1] *See St. P. & P.R.R. Co. v. Schurmeier,* 74 U.S. (7 Wall.) 272, 287–89, 19 L.Ed. 74 (1868). *See also,* article by Professor Robert E. Beck, *Boundary Litigation and Legislation in North Dakota,* Vol. 41, N.D.L.Rev. 424, 439–441 (May 1965)."

Although the language "common to both" rationally could have been construed to mean a tenancy in common, we nonetheless held that ownership of the riverbed was in severalty. Our holding illustrates a preference for divided interests.

Our decisions have recognized that a landowner with several ownership of land abutting a nonnavigable lake owns the bed of the lake in severalty. *State v. Brace,* 76 N.D. 314, 36 N.W.2d 330 (1949); *Brignall v. Hannah,* 34 N.D. 174, 157 N.W. 1042 (1916). Thus, in *State v. Brace, supra,* 36 N.W.2d at 334, we quoted with approval from *Brignall v. Hannah, supra:*

"In paragraph 6 of the syllabus the common law rule is stated thus, 'The owners of land abutting upon a meandered, nonnavigable lake *own the lake bed in severalty,* their respective titles extending

mark. All navigable rivers shall remain and be deemed public highways. In all cases when the opposite banks of any stream not navigable belong to different persons, the stream and the bed thereof shall become common to both."

**6.** Section 47–06–05, N.D.C.C., provides:

to the center of the lake.' " [Emphasis added.]

So too, our decisions have consistently permitted landowners with several ownership of land abutting a lake or stream to take land bared by accretion in severalty. *See, e.g., Jennings v. Shipp,* 115 N.W.2d 12 (N.D.1962); *Hogue v. Bourgois,* 71 N.W.2d 47 (N.D.1955); *Roberts v. Taylor,* 47 N.D. 146, 181 N.W. 622 (1921). These cases illustrate a preference for divided ownership of accretions where the prior ownership of the land abutting the lake or river was divided.

In *Perry v. Erling,* 132 N.W.2d 889 (N.D.1965), land, originally surveyed as riparian, was submerged by encroaching river erosion causing land, originally surveyed as non-riparian, to become riparian. The river subsequently shifted back, causing the land originally surveyed as riparian to reemerge. We held that under Section 47–06–05, N.D.C.C.,[6] the title to the reemerging land rested with the owner of the original riparian land and not with the owner of the original non-riparian land. Significantly, in *Perry,* the original riparian owner took separate title to the reemerging land without sharing on an undivided basis with the original non-riparian owner. *Perry* again illustrates a preference for divided ownership where the ownership of the original riparian land was in severalty.

At common law, avulsion did not result in a change in title. *Furlong I,* 423 N.W.2d at 134. Section 47–06–07, N.D. C.C., modifies common law by providing that avulsion results in a change of title when a stream "forms a new course abandoning its ancient bed." *Id.* However, for purposes of our analysis in this case, we do not believe that modification requires us to abandon the principle favoring divided ownership which is set forth in the preceding cases. We believe those decisions lend sup-

"*Riparian accretions.*— Where from natural causes land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any existing right of way over the bank."

port for our conclusion that Section 47–06–07, N.D.C.C., contemplates ownership of the abandoned riverbed in severalty in cases where former ownership of the new riverbed was in severalty.

Title 47, N.D.C.C., provides another illustration that the award of property in severalty is the usual rule in real property. While the indemnification under Section 47–06–07, N.D.C.C., involves a statutory exchange of property rather than a consensual exchange of property, we believe Section 47–10–13, N.D.C.C., which deals with consensual transfers of property, is relevant. Under Section 47–10–13, N.D.C.C., fee simple title is presumed to pass by a grant unless it appears from the grant that a lesser estate was intended. Absent contrary intent, Section 47–06–07, N.D.C.C., should be construed to provide for several ownership if several ownership existed before. Our construction provides predictability and certainty in the area of property rights and real estate titles where, in the absence of an indication to the contrary, ownership in severalty is the preferred and normal type of ownership. It also more fully restores the parties to their former positions by providing them with the same kind of ownership that they formerly enjoyed, i.e., divided ownership. We conclude that Section 47–06–07, N.D.C.C., contemplates that the former several owners of the new riverbed own this abandoned riverbed in severalty.

The plaintiffs also contend that if ownership of the minerals under the abandoned riverbed is several, the minerals should be divided according to their present value in proportion to the surface lost to the new riverbed. The trial court did not decide any issues involving the actual division of the abandoned riverbed. Neither do we.

The district court judgment is reversed and the case is remanded for further proceedings.

ERICKSTAD, C.J., and GIERKE and MESCHKE, JJ., concur.

VANDE WALLE, Justice, concurring specially.

If we accept the premise that interests in oil and gas are classified as minerals and that minerals are classified as interests in real property, and therefore governed by the same legal principles that govern surface lands, the majority's syllogism is impeccable, i.e., real-property law favors divided interests over undivided interests as demonstrated in cases involving the rights of riparian landowners and the consequences of accretion, erosion, avulsion, and relictions; the oil and gas rights at issue are interests in real property which underlie the former bed of a diverted river; therefore the law favors divided interests over undivided interests in determining ownership to the oil and gas rights underlying the old bed and we should construe section 47–06–07, NDCC, accordingly.

We have held that interests in oil and gas are classified as minerals [*State v. Amerada Petroleum Corp.*, 78 N.D. 247, 49 N.W.2d 14 (1951)] and that a mineral interest is generally classified as an interest in real property [*Yttredahl v. Federal Farm Mortgage Corporation*, 104 N.W.2d 705 (N.D.1960)]. Therefore, I believe I must concur in the result reached by the majority opinion although it may well be that by allocating undivided interests in the old riverbed the trial court applied greater "principles of justice and equity" than we do by requiring divided interests. Because the interests have not yet been allocated, the end result is yet to be determined.

Furthermore, I believe that section 47–06–07, NDCC, is, if read without regard to these related matters, susceptible of a construction that permits, if not requires, undivided interests. The words, "each in proportion to the land of which he has been deprived," although concededly ambiguous, seem to me to allow such a result. But, when compared with these related matters, which I agree is a logical analogy, there appears to me to be only two methods by which to achieve a different result.

The first is to abandon the concept [or perhaps fiction] that oil and gas are considered minerals and therefore interests in

real property to be governed by those same rules that govern surface interests in real property. That theory apparently arose when little was known of the manner in which oil and gas occurred or of the characteristics of those substances themselves in the reservoir.[1] It may be more aptly applied to minerals which remain in place until mined, such as the "hard" minerals, than to oil and gas. This would appear to be particularly true where, as here, wells have been drilled into what may be a common source of supply. Nevertheless, I believe that the concept which classifies interests in oil and gas as interests in real property to be governed by principles of real property is so entrenched in our jurisprudence that it is impossible, if not unwise, to attempt to foster a new or different concept of the legal nature of those substances.[2]

The second method of achieving a different result from that ordinarily applied to the surface of the old riverbed might be to construe section 47–06–07 to authorize divided or undivided interests, depending upon principles of justice and equity in a given instance. Because no division of the property has occurred as a result of the Rule 54(b), NDRCivP, order delaying the determination of the actual division, we have no evidence before us to determine whether divided or undivided interests would be the more just and equitable. That determination would as noted above, depend upon such circumstances as the quality of the interest lost, whether the common source of supply has been disturbed by prior production from the reservoir, and several other factors.

I considered urging a construction of the statute which would permit a case-by-case determination as the better solution to this problem, thus delaying a decision on whether or not divided or undivided interests would produce the more just result in this instance. I have abandoned it. Particular-

ly in the area of real property interests, we apparently worship at the altar of certainty in determining title to real property [*see* Anderson and Edin, *The Growing Uncertainty of Real Estate Title,* 65 N.D.L.Rev. 1 (1989)], regardless of the consequences. Apportioning the interests in the old riverbed as divided interests rather than undivided interests in each instance, regardless of whether or not an equitable result is achieved thereby, will provide certainty if not justice and equity. If our construction, or the result of our construction, of section 47–06–07 offends the legislature it is, of course, at liberty to amend it.

---

1. For a discussion of the nature of oil and gas, see R. Sullivan, Handbook of Oil and Gas Law, § 10, et seq. (4th printing 1961) and authorities cited therein.

2. Nevertheless, we have not always applied the law applicable to ordinary real property interests to mineral rights. *See Holman v. State,* 438 N.W.2d 534 (N.D.1989) [mineral leases should not be governed by the law or policy applicable to ordinary landlord and tenant leases].