KIM–GO, H.K. Minerals, Inc., a North Dakota corporation, R.N. Erickson, Nora S. Erickson, Mildred Erickson, Alice Langsdorf, Ruth Bovee, Mary A. Olson, Gladys Monson, E.W. Erickson, James G. Erickson, Wayne Dobie, individually and as guardian for Steven Dobie and Joseph Dobie, Jr., William K. Erickson, and Steven Jay Erickson, Plaintiffs, Appellants and Cross–Appellees,

v.

J.P. FURLONG ENTERPRISES, INC., a North Dakota corporation; Nantasket Petroleum Corporation, a Colorado corporation; David A. Papineau and Catherine Mary Papineau, Defendants, Appellees and Cross–Appellants,

Sun Exploration and Production Company, a corporation; State of North Dakota; Grace M. Oyloe; Orville Oyloe; Ladd Petroleum Corporation, a corporation; R.E. Puckett; and Bruce P. Alfson, Defendants.

Civ. No. 910210.

Supreme Court of North Dakota.

April 30, 1992.

Richard A. McKennett of Winkjer, McKennett, Stenehjem, Trotter & Reierson, Williston, for plaintiffs, appellants and cross-appellees.

Owen L. Anderson, Austin, Tex., and Fred C. Rathert of Bjella, Neff, Rathert, Wahl & Eiken, PC, Williston, for defendants, appellees and cross-appellants.

VANDE WALLE, Justice.

Having decided that section 47–06–07, NDCC, grants title to minerals underlying an abandoned riverbed to those people who lost minerals as a consequence of the Missouri River changing its course, *J.P. Furlong Enterprises, Inc. v. Sun Exploration & Production Co.*, 423 N.W.2d 130 (N.D. 1988), and that the mineral interest received by virtue of that section will be held in severalty when the minerals lost were held in severalty, *Kim–Go, H.K. Minerals, Inc. v. J.P. Furlong Enterprises, Inc.*, 460 N.W.2d 694 (N.D.1990), we are now asked to review the trial court's division of the mineral interests in the abandoned riverbed. We affirm the division ordered by the trial court.

A brief recitation of facts is sufficient for this opinion; a thorough development of the facts is made in the *J.P. Furlong* and *Kim–Go* decisions. In the 1950s the United States Army Corps of Engineers (Corps) acquired by eminent domain the surface rights to land adjoining portions of the Missouri River. The former owners reserved their mineral interest in the land taken by the Corps. The land taken included an area around an oxbow river course along the boundary of Williams and McKenzie counties. In 1958, the Corps cut a new channel at the base of the oxbow. Upon the flooding of the new channel, the State of North Dakota became the owner of the riverbed in that channel. *Kim–Go, supra.* The ownership of the mineral interests underlying the old channel has been the subject of considerable litigation, this appeal being the latest installment.[1]

In *J.P. Furlong Enterprises, Inc. v. Sun Exploration & Production Co., supra,* various mineral interest owners (collectively "the Papineaus") who had owned minerals underlying the new river channel sued the State of North Dakota and its mineral-lease holder, claiming that the Papineaus, not the State, owned the minerals underlying the abandoned channel. This court held that section 47–06–07, NDCC, applies to determine ownership of oil and gas interests underlying an abandoned riverbed. In *Kim–Go, H.K. Minerals, Inc. v. J.P. Furlong Enterprises, Inc., supra,* mineral interest owners (collectively, "the Ericksons") who had not participated in the *J.P. Furlong* litigation sued the Papineaus claiming an undivided interest in the abandoned river channel. We held that where ownership of land lost to a new riverbed is held in severalty, ownership of the abandoned riverbed acquired pursuant to section 47–06–07, NDCC, is in severalty. Ac-

---

**1.** We have not been asked to determine ownership of the surface, separate from the oil and gas rights, under the old riverbed.

cordingly, we reversed a district court judgment awarding title to the various interests as tenants in common.

On remand, the court held a trial to set the boundary between the several interests of the parties. The parties stipulated that the Papineau interest in the land taken for the new channel was the western 76 percent and the Erickson interest was the eastern 24 percent. The Ericksons argued for an elaborate division in which the abandoned river channel is divided into nineteen potential oil and gas spacing units and the Papineaus receive the western 76 percent and the Ericksons the eastern 24 percent of each spacing unit.[2] The Papineaus asked the court to divide the abandoned channel into two parcels by extending a line from the boundary between the parcels lost to the new channel to a corresponding point in the abandoned channel. Under this method, the Ericksons received the eastern 24 percent of the abandoned channel and the Papineaus the western 76 percent. The trial court adopted the Papineaus's method.

In *J.P. Furlong* and *Kim–Go* we discussed the rules governing ownership of abandoned and new river channels resulting from an avulsive change of the channel.[3] In those discussions we reviewed several cases, from a jurisdiction with similar law that dealt with ownership of an abandoned "oxbow" channel which occurred when a river made a new channel by cutting across the base of a peninsula. *See Fitzsimmons v. Cassity*, 172 So. 824 (La. Ct.App.1937); *Dickson v. Sandefur*, 259 La. 473, 250 So.2d 708 (1971). These cases involved disputes between landowners on the banks of the abandoned channel who claimed part of the abandoned channel under the law of accretion, on the one hand, and, on the other hand, land owners who had lost land to the new channel and who

claimed the abandoned channel under the law of avulsion.[4] In those cases the law governing avulsive changes vests ownership of the entire abandoned channel to the landowner who lost land to the new channel. The law of accretion does not apply.

None of the oxbow channel cases involves the relative rights to the abandoned channel of adjacent landowners who lost land to the new channel. The only rules we have found which divide "new" land between adjacent landowners are found in the law of accretion. The method for making the division is set out in *Jennings v. Shipp*, 115 N.W.2d 12 (N.D.1962):

"The rule is, 1. To measure the whole extent of the ancient bank or line of the river, and compute how many rods, yards or feet, each riparian proprietor owned on the river line. 2. The next step is, supposing the former line, for instance, to amount to 200 rods, to divide the newly formed bank or river line into 200 equal parts, and appropriate to each proprietor as many portions of this new river line, as he owned rods on the old. Then, to complete the division, lines are to be drawn from the points at which the proprietors respectively bounded on the old, to the points thus determined as the points of division on the newly formed shore. The new lines, thus formed, it is obvious, will be either parallel, or divergent, or convergent, according as the new shore line of the river equals, or exceeds or falls short of the old." 115 N.W.2d at 16. [Quoting *Conkey v. Knudsen*, 143 Neb. 5, 8 N.W.2d 538 (1943)].

*See also Payne v. Hall*, 192 Iowa 780, 185 N.W. 912 (1921) [plat drawing applying method]. This is the method applied by the trial court to divide the abandoned channel

---

**2.** Five of the nineteen quarter-sections have been designated as production spacing-units by the North Dakota Industrial Commission, and each unit contains a producing oil well. All five of these areas fall within the portion of the channel apportioned to the Papineaus by the trial court.

**3.** In *J.P. Furlong Enterprises, Inc. v. Sun Exploration & Production Co.*, 423 N.W.2d 130, 133 n. 4 (N.D.1988), we defined "Avulsion" as "the sud-

den inundation or sweeping away of land resulting from a sudden change in the course of a waterbody."

**4.** In *J.P. Furlong, supra* note 3, we defined "Accretion" as "the gradual deposit and addition of soil along the bank of a waterbody caused by the gradual shift of the waterbody away from the accreting bank."

of the Missouri River between the Papineaus and the Ericksons.

The Ericksons argue that North Dakota law "requires a blending of the strict riparian rules and the need to do justice and equity" and that their patch-work division is more just and equitable. As authority for this "blending," Ericksons cite language from *Gardner v. Green,* 67 N.D. 268, 271 N.W. 775 (1937) and cases collected in *United States v. 1629.6 Acres,* 335 F.Supp. 255 (D.Del.1971). In *Gardner,* the court included a statement that the main objects of any division of accretions "is that the division shall be equitable and that it shall be proportional so as to give each shore owner a fair share of the land to be divided and his due portion of the new shore line proportionate to his share on the original line of the water." 271 N.W. at 783. In *United States v. 1629.6 Acres,* the federal district court quoted statements to the effect that access to water is the most valuable right of a riparian landowner. 335 F.Supp. at 269. From these invocations of "equity," "fairness" and "value," Ericksons contend that North Dakota law *requires* a departure from the *Jennings v. Shipp* method and the adoption of their value-based method for dividing the abandoned river channel which gives each party interests throughout the channel including the proven production areas.

■ We can find no authority for using "equity" or "value" as Ericksons advocate. Cases from many jurisdictions do refer to access to water as the most valuable feature of riparian land. *E.g. Hughes v. Washington,* 389 U.S. 290, 88 S.Ct. 438, 19 L.Ed.2d 530 (1967) [access to water often most valuable asset of riparian land]; *accord Waring v. Stinchcomb,* 141 Md. 569, 119 A. 336 (1922); *Lamprey v. Metcalf,* 52 Minn. 181, 53 N.W. 1139 (1893); *see also* 1 *Robert E. Beck & Joseph W. Dellapenna, Waters & Water Rights* § 6.01(a)(1) (Robert E. Beck ed., 1991). We read "value" as being used in these decisions in the sense of a defining characteristic; riparian lands adjoin water. If value (in the sense of relative worth) is a factor in dividing accretions, logically a court should alter the proportional division of accretions to account for unequal value of the accreted lands as riverfront property, that is, as a beach or for a dock, wharf or some other use which depends upon access to the river. But we have not found, and Ericksons have not cited, any case in which a court makes such an altered division. In fact, access to the river by apportioning the new shore of the river has been the only consideration; the usefulness or value of the new shore or the accreted lands has never been a factor.

For example, in *Steinem v. Romney,* 233 Md. 16, 194 A.2d 774 (1963), the court reviewed the rights of four owners of riverfront lots to a sandbar in a navigable river. Steinem claimed the entire sandbar which was attached to his lot and which extended in front of the other three lots. A non-navigable stream separated the three lots from the sandbar; the owners of those lots had to build bridges from their original shore line over the stream in order to reach the sandbar and the navigable river. The court held all four lot owners had rights to the sandbar by accretion and described their right in terms of the portion of the sandbar located in front of the lot. While the case did not involve a dispute as to the actual boundaries on the new shore line, nothing in the opinion suggests a standard other than the proportional-division rule.

■ We have held that section 47–06–07, NDCC, does not distinguish between mineral and surface rights to the abandoned channel. *J.P. Furlong, supra.* We have held that one who loses property held in severalty is entitled to receive a share of the abandoned channel in severalty. *Kim-Go, supra.* Recognizing that their argument must apply to both the surface and mineral estates, Ericksons argue that dividing the surface according to their plan would be fair. In the case of the Papineaus, however, the loss of approximately 56 contiguous acres would be replaced with approximately 890 acres in nineteen parcels spread over portions of nineteen quarter-sections. The fact that the Papineaus own a mineral, not surface, interest does not make this fragmentation of their property interest less burdensome. This case is not

an instance where the Ericksons lost property of great value and received property of no value while the Papineaus lost property of no value and received property of great value. Instead, the Erickson interest was increased from approximately 18 acres to approximately 282 acres. The value of that interest rose from approximately $90 at the time the new channel was flooded in 1958 to $11,290 at the time of the trial. The fact that the property received by the Papineaus is even more valuable does not appear to us to so offend "principles of justice and equity" that this court is compelled to depart from a clear and long recognized method of allocating rights to an abandoned channel among adjacent landowners. *Kim–Go*, 460 N.W.2d at 698 (VandeWalle, J., Concurring).

■ J.P. Furlong Enterprises, Inc., and the other lease-hold interests derived from the Papineaus cross-appeal from the trial court's denial of contribution. The Papineau lease-hold interests sought compensation from the Erickson lease-hold interests for the expenses incurred during the *J.P. Furlong* litigation in which the Papineaus's

interest in a specific portion of the abandoned channel was established. Under the facts of this case, in particular, the fact that the Papineaus and Ericksons are not tenants in common, the trial court did not abuse its discretion in denying contribution.

The judgment of the district court is affirmed in all parts.

ERICKSTAD, C.J., LEVINE and MESCHKE, JJ., and KIRK SMITH, District Judge, concur.

KIRK SMITH, District Judge, sitting as a member of the Court to fill the vacancy created by the resignation of H.F. GIERKE, III, J. JOHNSON, J., not being a member of this Court at the time this case was heard did not participate in this decision.