**SOUTHEAST HUMAN SERVICE CENTER, DEPARTMENT OF HUMAN SERVICES, Appellant,**

**v.**

**Sandra EISEMAN and State Personnel Board, Appellees.**

**Civ. No. 940109.**

Supreme Court of North Dakota.

Dec. 20, 1994.

Cary R. Stephenson (argued), Sp. Asst. Atty. Gen., Fargo, for appellant.

Mark G. Schneider (argued), Schneider, Schneider & Schneider, Fargo, for appellee Sandra Eiseman.

William Maxwell (argued), Asst. Atty. Gen., Ins. Dept., Bismarck, for appellee State Personnel Bd.

LEVINE, Justice.

Southeast Human Service Center (SEHSC), a component of the North Dakota Department of Human Services, appeals from a district court judgment affirming a decision by the North Dakota State Personnel Board (Board) ordering Sandra Eiseman reinstated to her job at SEHSC. SEHSC also appeals from the court's award of attorney's fees to Eiseman under N.D.C.C. § 28-32-21.1. We reverse.

On July 31, 1991, SEHSC terminated Eiseman from her nonprobationary, classified position as a Vocational Rehabilitation Counselor I on the grounds that she was absent from work without authorization for more than three consecutive working days and that she had failed to comply with SEHSC directives to return to work. Eiseman had been employed at SEHSC since September 16, 1974, and when she was terminated, she was working in the Vocational Rehabilitation Unit under the direction of Terrence Lien, the SEHSC Regional Program Administrator.

Eiseman did not experience any respiratory problems at work until SEHSC moved its office in 1982. Then, Eiseman and other SEHSC employees began having respiratory problems associated with poor air quality at the new office. On several occasions, the SEHSC Regional Director, Gerald Korsmo, informed the landlord about the poor air quality at that office. Eventually, the ventilation system was remodeled, but Eiseman continued to complain about the poor air quality and its effect on her health.

On April 8, 1991, Eiseman asked Lien for extended medical leave because of "illness due to the indoor pollution at the work site which makes it impossible for [her] to return to work at this time." Lien granted her leave through April 17, 1991, which he deducted from her balance of six hours of sick leave and from her annual leave. Lien also asked her to supply any recent medical reports from her attending physician concerning her current illness.

Eiseman submitted letters from two physicians, Dr. Patrick Stoy and Dr. L.B. Silverman. Dr. Stoy reported that Eiseman suffered from "a persistent respiratory problem precluding her from performing her normal work activities," but anticipated that she "would likely recover from this and be able to resume her normal job duties." Dr. Silverman diagnosed an "environmental type of illness" with symptoms of "periodic cough, fatigue, inability to concentrate and other difficulties which affect her ability to function on the job." According to Dr. Silverman, Eiseman's greatest difficulty was a "sensitivity to formalin and the petrochemical ethanol which is quite often present in buildings and in shopping malls." He suggested that she use a special face mask with activated charcoal and a portable air cleaner, and recommended that she be assigned a work place away from the exposure.

At Eiseman's request, Lien granted her additional leave through April 24, 1991, which he deducted from her annual leave. However, Lien noted that the extension of leave would cause further deterioration in the quality of Eiseman's service to her clients and asked her to return to work as soon as possible.

On April 22, 1991, Eiseman requested a medical leave of absence due to her "environmental illness/chemical sensitivities caused by exposures at work [which] have resulted in respiratory problems." Eiseman also requested a reasonable accommodation at a chemically uncontaminated workplace for her disabling condition. Lien granted Eiseman leave without pay from April 25, 1991, and informed her that SEHSC would test the office for the two elements identified in Dr. Silverman's report, formalin and petrochemical ethanol. Independent laboratory testing of air samples from the SEHSC office revealed the presence of formalin and petrochemical ethanol, but within OSHA permissible exposure limits. After receiving the test results, Korsmo cancelled Eiseman's leave of absence on June 11, 1991, and asked her to return to work by June 17, 1991.

Eiseman told Korsmo that the tests were of "no value" and deprived her of her rights as a handicapped individual. She requested an additional leave of absence until she was accommodated with an uncontaminated work site. Lien notified Eiseman that SEHSC would not extend her leave of absence and that he would recommend initiation of a dismissal action if she did not return to work by June 24, 1991.

On June 21, 1991, Eiseman again requested an extension of her leave of absence, stating:

"You obviously do not understand the chemical sensitivity diagnosis. I developed chemical sensitivity due to PAST substantial indoor air quality violations at work. I am not claiming that those violations still

exist. In fact, I have been informed that maintenance work may have been done by the landlord to correct violations before these tests were even performed. Therefore, the current test results are meaningless from this perspective also. . . .

"My claim is that due to these past workplace exposures I have developed a chemical sensitivity syndrome. This means that adverse symptoms and health damage can occur at exposure levels far below the [permissible exposure limits]. The disability that I am claiming is Multiple Chemical Sensitivities/Environmental Illness, and you have completely failed to address this issue.

"Your failure to address my chemical sensitivity disability is a violation of my rights as a handicapped individual under the Rehabilitation Act of 1973 and the soon-to-be-implemented Americans with Disabilities Act."

During this time, Lien learned of medical literature questioning the validity of claims of environmental illnesses and criticizing the methods employed by clinical ecologists. Korsmo suggested that, before SEHSC proceeded with pretermination procedures, Eiseman's medical records be reviewed and she be examined by a specialist chosen and paid for by SEHSC. Eiseman requested that the physician be affiliated with the American Academy of Environmental Medicine and have direct experience with multiple chemical sensitivities. SEHSC thereafter selected David Ellison, M.D., a clinical toxicologist at St. Luke's Hospital in Fargo, to examine Eiseman.

On July 17, 1991, Eiseman responded that she had "checked on Dr. Ellison's qualifications and find him to be unqualified per what I have found out through trial and error are necessary qualifications for an accurate diagnosis of my illness." Eiseman informed Korsmo that she was scheduled to consult with a "qualified" physician on July 31, 1991, in Seattle, Washington:

"I request that you allow me to see this physician at your expense. If not, I will pay for it myself. My reasoning is that I want a physician who at least has directly diagnosed and treated someone with multiple chemical sensitivities. There is no indication that Dr. Ellison has diagnosed and treated anyone with multiple chemical sensitivities. Without this experience, Dr. Ellison is simply dealing with abstract concepts. He is not acting as a physician. My illness does not depend on whether he accepts the scientific validity of someone else's hypothesis. I am a real person who has a real health problem. If he has no experience in actually diagnosing and treating people with multiple chemical sensitivities, then he is not qualified to review my records.

"If you decide not to pay for my expenses, then I request that you extend my leave of absence until such time as I can obtain a second opinion from a medical specialist with both qualifications and experience in my disability area. I will be taking all medical information to him for his review also."

On July 18, 1991, Korsmo gave Eiseman pretermination notice of the allegations against her with an opportunity to respond by July 25, 1991. Korsmo noted that Eiseman had refused to see a medical doctor chosen by SEHSC for a second medical opinion. Eiseman responded:

"[P]lease reread my letter dated July 17, 1991, in which I listed the qualifications and experience necessary to obtain an accurate diagnosis of multiple chemical sensitivity, and note that I am not refusing to get a second medical opinion from a qualified physician who has experience with diagnosing and treating people with multiple chemical sensitivity. . . . In fact, I am so concerned about obtaining as accurate and comprehensive a picture of my overall health as possible that I am willing to pay for the expenses myself. I will be seeing Dr. David Buscher. After I have seen Dr. Buscher and when I have received his report I will then, if you wish, also see Dr. Ellison. . . .

"I find it confusing that you will probably be giving me written notice of termination 'on or before July 31, 1991,' the very day I am presently scheduled to see Dr. Buscher for a second medical opinion/analysis at my expense. It seems the Department does

not want a second medical opinion. Perhaps you want to terminate me before you get it so that my only recourse from that point would need to be legal action."

SEHSC terminated Eiseman effective July 31, 1991, on the grounds that she was absent from work without authorization for more than three consecutive working days and that she had failed to comply with SEHSC directives to return to work. The Department of Human Services upheld Eiseman's termination, noting that she had been unwilling to submit to a medical evaluation and that her claim for reasonable accommodation could not be fully addressed because of that refusal.

Eiseman appealed to the Board, which assigned a hearing officer to conduct an administrative hearing. The hearing officer recommended upholding Eiseman's termination. The Board initially rejected the hearing officer's recommendation and ordered Eiseman reinstated. SEHSC appealed, and the district court remanded for reconsideration, concluding that the Board had improperly considered evidence which had not been presented at the administrative hearing. On remand, the Board concluded that Eiseman was terminated without cause and ordered her reinstated, with back pay and benefits.

SEHSC again appealed the Board's decision. The district court then upheld the Board's order reinstating Eiseman. The court also concluded that SEHSC's second appeal was without substantial justification and awarded Eiseman attorney's fees under N.D.C.C. § 28–32–21.1. SEHSC appealed.[1]

I

Relying on *Berger v. State Personnel Board*, 502 N.W.2d 539, 541, n. 4 (N.D.1993), Eiseman contends that the Board's order reinstating her is "final" under N.D.C.C. § 54–44.3–07(3) and, therefore, is not appealable under N.D.C.C. § 28–32–15(1). SEHSC responds that N.D.C.C. § 54–44.3–07(3), does not declare Board orders unappealable and any contrary implication from *Berger* is dictum.

In *Hammond v. North Dakota State Personnel Bd.*, 332 N.W.2d 244 (N.D.1983), this court held that the Board was an "administrative agency" as defined by N.D.C.C. § 28–32–01 and that N.D.C.C. § 28–32–15(1) authorized appeals from final decisions of the Board. Since *Hammond*, decisions of the Board have been appealable under N.D.C.C. § 28–32–15(1), which says that "[a]ny party to any proceeding heard by an administrative agency, except in cases where the order of the administrative agency is declared final by any other statute, may appeal from the order." *See, e.g., Berdahl v. North Dakota State Personnel Bd.*, 447 N.W.2d 300 (N.D. 1989).

In 1991, the Legislature enacted N.D.C.C. § 54–44.3–07(3), which authorizes the Board to "[h]ear, consider, and determine appeals by nonprobationary employees in the classified service from agency grievance procedures ... related to ... dismissal" and says "[t]he board's decision on appeal shall resolve the issues presented between the employer and employee." 1991 N.D.Sess.Laws, ch. 607, § 2. In *Berger, supra*, 502 N.W.2d at 541, n. 4, this court said:

"In *Hammond v. North Dakota State Personnel Board*, 332 N.W.2d 244 (N.D. 1983), we ruled that the State Personnel Board was an administrative agency and its final orders appealable under N.D.C.C. ch. 28–32. Since *Hammond* was decided, the legislature amended N.D.C.C. § 54–44.3–07(3), providing that the 'board's decision on an appeal shall resolve the issues presented between the employer and employee.' Administrative Agency orders 'declared final' by statute are not appealable under the terms of N.D.C.C. § 28–32–15. *Berger*, however, is not an employee of the state."

At issue in *Berger* was the Board's authority to award Berger, an unsuccessful applicant for a job with the State Soil Conservation Committee, attorney's fees under N.D.C.C. § 54–44.3–07(3). A majority of this court affirmed the Board's denial of attor-

---

**1.** SEHSC and the Board are state entities and both are represented by the attorney general. Section 54–12–01(3), N.D.C.C., outlines the procedure for appointment of counsel for one of the parties in cases like this.

ney's fees, holding that N.D.C.C. § 54–44.3–07(3) was limited to appeals " 'by nonprobationary employees,' " and was not applicable to Berger's claim because she was not, and had never been, a state employee. *Berger, supra,* 502 N.W.2d at 542. We concluded that the Board did not have authority to hear Berger's appeal, because its authority was limited to appeals involving " 'nonprobationary employees' " and to issues between " 'employer and employee.' " *Id. Berger* thus held that N.D.C.C. § 54–44.3–07(3) does not authorize an unsuccessful applicant for a state position to appeal to the Board from an unfavorable hiring decision. *Berger* did not hold that nonprobationary, classified employees are precluded from appealing Board decisions.

When the Legislature has intended to make agency decisions unappealable, it has said so clearly with language denoting the finality of an agency decision. N.D.C.C. §§ 65–05–04 ("There is no appeal from a [workers compensation] bureau decision not to reopen a claim after the bureau's order on the claim has become final.") and 61–16.1–23 ("The state engineer ... shall only determine if there is any benefit to the landowner or political subdivision, and the determination of the state engineer upon such question is final."). *See Lass v. North Dakota Workmen's Compensation Bureau,* 415 N.W.2d 796 (N.D.1987); *Investment Rarities, Inc. v. Bottineau County Water Resource District,* 396 N.W.2d 746 (N.D.1986).

■ Words in a statute are given their plain, ordinary, and commonly understood meaning. *E.g., Kim–Go v. J.P. Furlong Enterprises, Inc.,* 460 N.W.2d 694 (N.D.1990). There is no reference in N.D.C.C. § 54–44.3–07(3) to the finality or unappealability of an order by the Board. Instead, the statute says that the Board is to "resolve the issues presented between the employer and employee." The plain meaning of the Board's duty to "resolve" issues is that the Board must decide disputes between the employer and employee. In setting out the Board's author-

ity, the statute does not address the right to appeal, which *Hammond* held was authorized by N.D.C.C. § 28–32–15(1).[2] We hold that N.D.C.C. § 54–44.3–07(3) authorizes the Board to determine disputed issues between employer and employee; it does not make a Board order final. Construing the two statutes together, as we must, *Westman v. North Dakota Workers Compensation Bureau,* 459 N.W.2d 540 (N.D.1990), we conclude that they authorize nonprobationary, classified state employees and their employers to appeal from orders by the Board.

## II

SEHSC contends that the Board's decision is not in accordance with the law because there was cause to terminate Eiseman. The Board and Eiseman respond that SEHSC did not have cause to terminate Eiseman and acted unreasonably in refusing to meet with her and objectively discuss her concerns and possible solutions.

■ Sections 28–32–21 and 28–32–19, N.D.C.C., outline this court's standard for reviewing an appeal from an administrative agency decision. *Berger, supra; Berdahl, supra.* Under those provisions, our review involves a three-step process to determine whether the agency's findings of fact are supported by a preponderance of the evidence, its conclusions of law are supported by its findings of fact, and its decision is in accordance with the law. *Bohac v. Graham,* 424 N.W.2d 144 (N.D.1988). In reviewing an administrative agency's findings of fact, we do not make independent findings or substitute our judgment for that of the agency; instead, we determine whether a reasoning mind could have reasonably determined that the agency's factual conclusions were supported by the weight of the evidence. *Berdahl, supra.*

Section 59,5–03–03–05, N.D.A.C., authorizes dismissal of a classified, nonprobationary state employee for "cause." *See also*

**2.** Nothing in the available legislative history for 1993 N.D.Sess.Laws, ch. 607, indicates that the Legislature intended to change the result of *Hammond v. North Dakota State Personnel Board,* 332 N.W.2d 244 (N.D.1983). Instead, the legis-

lative history indicates that the amendment was intended to confirm that the Board has authority to hear appeals by state employees. January 18, 1991 Minutes of State and Federal Government Committee of Senate regarding Senate Bill 2101.

N.D.A.C. § 4–07–19–03 ("employee may be disciplined only for cause"). When Eiseman was terminated, N.D.A.C. § 59.5–03–03–02(1) defined "cause" to "include[ ] conduct related to the employee's job duties, job performance, or working relationships which is detrimental to the discipline and efficiency of the service in which the employee is or was engaged."[3] *See also* N.D.A.C. § 4–07–19–02(1). Section 315–01–04–01 of the personnel policies for the Department of Human Services said that unauthorized absences for more than three consecutive working days constituted just cause for dismissal.[4]

In determining that SEHSC terminated Eiseman without cause, the Board framed the issue as "the relationship between the employer and employee and the employer's duty to protect the health of the state classified employee before dismissal when the evidence shows the work site to be detrimental to the health of the employee." The Board recognized a duty on SEHSC to provide a safe and healthy workplace for its employees and found that the evidence showed Eiseman's extraordinary sensitivity to the air quality at her work site was adversely affecting her health. The Board concluded that SEHSC was required to "at least try an off-site or alternate work location for Eiseman before dismissing her," and that her dismissal "before efforts were made to relocate her due to her individual reaction to the work environment was not for cause."

The Board relied upon the general rule that an employer has a duty to provide a safe workplace for its employees. *See Yuha v. Minneapolis, St. P. & S.S.M. Ry. Co.*, 42 N.D. 179, 171 N.W. 851 (1919). *See, e.g., International Brotherhood of Electrical Workers v. Hechler*, 481 U.S. 851, 107 S.Ct. 2161, 95 L.Ed.2d 791 (1987); *Heilweil v. Mount Sinai Hospital*, 32 F.3d 718 (2nd Cir.1994). *See generally,* Prosser and Keeton on Torts, § 80 (5th ed. 1984). However, the Board ignored the legal effect of

SEHSC's request that Eiseman submit to a medical examination by a doctor chosen by SEHSC.

■ An employee is generally obligated to comply with an employer's reasonable requests. *See* N.D.C.C. § 34–02–08; *McGregor v. Harm*, 19 N.D. 599, 125 N.W. 885 (1910) (employee's refusal to comply with employer's request to work one additional hour was unreasonable and, as a matter of law, justified discharge). *See also* Restatement (2nd) of the Law, Agency § 385(1) (1958) ("[u]nless otherwise agreed, an agent is subject to a duty to obey all reasonable directions in regard to the manner of performing a service that he has contracted to perform.").

■ Professors Corbin and Williston each instruct that an employee's disobedience of an employer's reasonable request is a ground for discharge. 9 Jaeger, Williston on Contracts § 1013B (3rd ed. 1967); 3A Corbin, Corbin on Contracts § 679 (1960). *See also* 53 Am.Jur.2d *Master and Servant* § 54 (1970). In the context of dismissals for absenteeism, courts have sustained terminations in cases where employees have not provided employers with appropriate medical documentation for the absences. *Maulding v. Sullivan*, 961 F.2d 694 (8th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1255, 122 L.Ed.2d 653 (1993); *Fong v. United States Department of Treasury*, 705 F.Supp. 41 (D.D.C.1989); *Evans v. Fulton County*, 200 Ga.App. 568, 408 S.E.2d 816 (1991); *Burks v. Phyfer*, 487 So.2d 903 (Ala.Civ.App.), *reversed on other grounds*, 487 So.2d 905 (Ala. 1985). *See Southern Tours, Inc. v. National Labor Relations Board*, 401 F.2d 629 (5th Cir.1968) (second medical opinion ordered by National Labor Relations Board was reasonable and necessary to determine if an employee had been discharged because of a physical disability); *Bodnar v. New York State Thruway Authority*, 52 A.D.2d 345, 383

---

**3.** Effective May 1, 1994, the definition of "cause" was changed from "includes" to "means." For a discussion of the difference between "includes" and "means" in definitions of terms, *see Americana Healthcare v. North Dakota Dept. of Human Services*, 510 N.W.2d 592, 594–95, n. 2 (N.D. 1994) [" 'An exhaustive definition uses the word

*means*, while a partial definition uses the word *includes*.' "]

**4.** Effective March 1994, that provision is found in Section 315–01–21(1) of the Department's personnel policies.

N.Y.S.2d 923 (1976) (employer cannot unilaterally decide that a second medical examination of employee would be fruitless). *Cf. Bozarth v. Atlantic Richfield Oil Co., Inc.,* 833 P.2d 2 (Alaska 1992) (employee's failure to comply with a reasonable order to participate in a private employer's drug testing program constituted cause for discharge). The lesson derived from those authorities is that an employer can reasonably request an employee to provide appropriate medical documentation, including a second medical opinion, where the employee claims that absences from work are due to illness.

In this case, Eiseman voiced concerns about air quality at the SEHSC office. She had not reported to work since March 28, 1991, and SEHSC was concerned about the effect of her absences on the delivery of services to clients. In response to a request by SEHSC, she submitted information about her condition from Dr. Stoy and Dr. Silverman. Dr. Stoy noted that Eiseman suffered from a "persistent respiratory problem precluding her from performing her normal work activities," but anticipated that she "would likely recover from this and be able to resume her normal job duties." Dr. Silverman diagnosed Eiseman as suffering from an "environmental type of illness" with a "sensitivity to formalin and the petrochemical ethanol which is quite often present in buildings and in shopping malls." Thereafter, SEHSC had the air quality at the work site tested, and the results of those tests indicated that the substances analyzed were within OSHA permissible exposure limits.

Meanwhile, SEHSC became aware of medical literature questioning the validity of claims of environmental illness and criticizing the methods employed by clinical ecologists. In a letter to Eiseman, Dr. Stoy explained that he did not agree with Dr. Silverman's approach and did not find validity in many of the types of tests he performed. Dr. Stoy noted that clinical ecologists have not "proven to the medical profession that their methodologies have any validity" and stated that he did "not feel that their methodology should be utilized until such studies prove its effectiveness."

■ Those factors raised a legitimate question about the specific nature of Eiseman's condition and its relationship to the air quality at her work site. It was in that context that SEHSC asked Eiseman to submit to a medical examination by a doctor of its choice. Eiseman's claim that the doctor chosen by SEHSC was "unqualified," did not legally justify her rejection of her employer's request. While she may have had grounds to contest the qualifications of the proposed doctor, after his examination of her and his report to SEHSC, she could not refuse unilaterally to comply with the request that she see him.

■ Because of the legitimate concerns about the nature of Eiseman's condition and its relationship to the air quality at the SEHSC work site, a reasoning mind could not reasonably conclude that SEHSC's request for Eiseman to submit to a medical examination by a doctor of its choice was unreasonable. We hold that SEHSC's request that Eiseman submit to an examination by the doctor chosen by SEHSC was, as a matter of law, reasonable. We decline to speculate on the course of events if Eiseman had complied with SEHSC's reasonable request. We hold that the Board's failure to recognize the legal effect of Eiseman's refusal to submit to an examination by a doctor chosen by SEHSC was not in accordance with the law. Because Eiseman failed to honor a reasonable request by her employer and was thereafter absent from the workplace without authorization for more than three consecutive working days, we hold that SEHSC had cause to terminate her employment.

■ Because SEHSC had cause to terminate Eiseman's employment, we also hold that the district court abused its discretion in determining that SEHSC's appeal was without substantial justification under N.D.C.C. § 28–32–21.1. *See Shark v. Northern States Power Co.,* 477 N.W.2d 251 (N.D.1991); *Aggie Investments GP v. Public Service Commission,* 470 N.W.2d 805 (N.D.1991).

We reverse the judgment and remand to the district court with instructions to remand

to the Board for entry of an order affirming SEHSC's dismissal of Eiseman.

VANDEWALLE, C.J., and NEUMANN, SANDSTROM and MESCHKE, JJ., concur.