J. Malcolm THOMPSON, Plaintiff and Appellant,

v.

Larry R. PETERSON, David B. Danbom, Yur–Bok Lee, Gerald Anderson, Thomas Isern, Harriette McCaul, Rick D. Johnson, all of whom are and/or were persons employed within the teaching faculty and/or administration at North Dakota State University, being named herein as having acted in both their individual and official capacities, and North Dakota State University, a publicly supported institution of higher learning under the control of the North Dakota State Board of Higher Education, Defendants and Appellees.

Civil No. 950276.

Supreme Court of North Dakota.

April 25, 1996.

David C. Thompson (argued), of David C. Thompson, P.C., Grand Forks, for plaintiff and appellant.

Douglas A. Bahr (argued), Assistant Attorney General, Attorney General's Office, Bismarck, and Sara Beth Gullickson (no appearance), Assistant Attorney General, Moorhead, MN, for defendants and appellees.

MESCHKE, Justice.

J. Malcolm Thompson appealed from a judgment dismissing his lawsuit against North Dakota State University (NDSU), and Larry Peterson, David Danbom, Yur-Bok Lee, Gerald Anderson, Thomas Isern, Harriette McCaul, and Rick Johnson in their official capacities as members of the faculty and administration of NDSU and in their individual capacities (collectively referred to as defendants).[1] Thompson sought damages and injunctive relief to remedy termination of his nontenured position as an assistant history professor. We affirm.

I

In 1991 Thompson accepted a nontenured, probationary appointment with NDSU as an assistant professor of history. Thompson's employment agreement with NDSU was expressly governed by the State Board of Higher Education Regulations on Academic Freedom, Tenure, and Due Process and by the NDSU University Senate Policy Implementing Procedural Regulations. NDSU renewed Thompson's probationary appointment for the 1992–93 and 1993–94 academic years.

On April 22, 1994, Peterson, the chair of the history department, notified Thompson that the tenured faculty in the history department had "concluded that [Thompson was] not making satisfactory progress toward successful promotion and tenure, especially in the area of teaching," and had "voted to recommend to the Dean of the College of Humanities and Social Sciences and Vice President for Academic Affairs that [his] probationary appointment should not be renewed." On April 28, Thompson made a written request to Peterson for a statement of "reasons that contributed to the decision for non-renewal of my probationary, tenure-track appointment." On April 29, Peterson informed Thompson that Section 351C.2 of the NDSU Policy Manual directed that nonrenewal decisions " 'shall be made in every instance by the University President,' " and that a nonrenewal decision had not yet been made in his case.

Meanwhile, Isern, the Dean of the College of Humanities and Social Sciences, and Sharon Wallace, Vice President for Academic Affairs, accepted the history department's recommendation for nonrenewal and forwarded it to NDSU President Jim Ozbun. On May 13, 1994, Ozbun notified Thompson that his faculty appointment at NDSU would not be renewed beyond the 1994–95 academic year and invited Thompson to "consult NDSU Policies 350 and 351 for your further procedural rights." Thompson did not pursue any further internal administrative remedies, and

---

1. Peterson, Danbom, Lee, and Anderson are tenured faculty in the history department at NDSU. Isern is the Dean of the College of Humanities and Social Sciences at NDSU. McCaul is Dean of the College of Business at NDSU. Johnson is university counsel for NDSU.

he received a "terminal contract" for the 1994–95 academic year.[2]

Thompson sued the defendants in Grand Forks County in the Northeast Central Judicial District, alleging, in substance, a breach of his employment contract; an infringement of his state constitutional rights to substantive and procedural due process, freedom of speech, and protection of his reputation; and a violation of the "secret personnel file" provisions of N.D.C.C. Ch. 15–38.2. The district court in Grand Forks County, the Honorable Kirk Smith, granted an ex parte temporary restraining order that prohibited NDSU from terminating Thompson and from hiring a replacement.

The defendants demanded a change of venue to Cass County in the East Central Judicial District.[3] The defendants also moved to vacate the temporary restraining order and to dismiss Thompson's complaint. Judge Smith granted the defendants' motion to change venue to Cass County, but declined to rule on the remaining motions.

The action was then venued in Cass County, and eventually assigned to the Honorable Norman J. Backes. Judge Backes dismissed Thompson's complaint, concluding that the decision not to renew Thompson's teaching contract was made by NDSU President Ozbun on May 13, 1994, and that Thompson did not make a written request to Ozbun for the reasons for the nonrenewal decision as required by Section 605(c) of the State Board Regulations. Judge Backes ruled that Thompson's April 28, 1994 request to Peterson was misdirected and premature, and because Thompson had failed to exhaust his administrative remedies, the court lacked jurisdiction to hear his lawsuit. Thompson appealed.

## II

Thompson contends Judge Smith should have remained the presiding judge in this lawsuit, and Judge Backes's dismissal was without jurisdiction and was null and void. Thompson asserts a change of venue and the designation of a presiding judge are two different subjects. He argues that, although the defendants had a threshold statutory right to have this lawsuit tried in Cass County, they waived their right to file a demand for change of judge by requesting a change of venue from Grand Forks County to Cass County. Thompson's argument mistakes the effect of a change of venue from one judicial district to another.

■ Jurisdiction is the power and authority of a court to hear and decide a case, *Rudnick v. City of Jamestown*, 463 N.W.2d 632 (N.D.1990), while venue means the place where the power to decide a case is to be exercised. *Selland v. Selland*, 494 N.W.2d 367 (N.D.1992). Under N.D. Const., Art. VI, § 8 and NDCC 27–05–06, district courts in North Dakota have authority to hear and determine civil actions. *See Rudnick* (district court had jurisdiction to hear claim that employee's demotion violated due process). The district court in Cass County had authority to hear this lawsuit, and the question here is the effect of the change of venue on the assignment of the judge.

Subject to other specific exceptions in NDCC Ch. 28–04, venue for a civil action is generally "in the county in which the defendant or one of the defendants resides at the time of the commencement of the action." NDCC 28–04–05; *Varriano v. Bang*, 541 N.W.2d 707 (N.D.1996). An action may be tried in an improper venue "unless the defendant, before the time for answering expires, demands in writing that the trial be had in the proper county." NDCC 28–04–06; *Varriano*. If the county designated for trial in a complaint is an improper venue, the court may change the place of trial. NDCC 28–04–07(1). Under NDCC 27–05–26, a change of venue may be taken from "one judge to another in the same district or in another district, or from one county to another, or from one district to another in the manner provided by law." When venue is changed, NDCC 28–04–08 directs that all further pro-

---

2. A "terminal contract" means a teacher's employment terminates at the conclusion of the academic year. *Stensrud v. Mayville State College,* 368 N.W.2d 519 (N.D.1985).

3. NDSU is located in Cass County, and six of the seven individual defendants live in Cass County. The seventh individual defendant, Anderson, lives in Clay County in Minnesota.

ceedings must be had in the county where the place of trial is changed to. With exceptions not relevant here, NDCC 27–05–22 declares that no judge of a district court may hear any action in a judicial district where the judge was not elected.

■ When a change of venue has been granted, our civil venue statutes do not explicitly allow the judge granting the change to follow the case from one judicial district to another judicial district. *Compare* NDRCrimP 21(c) ("Whenever the place of trial is change as provided in this Rule ... the judge ordering the transfer shall preside at the trial.") When our venue statutes are construed together to give meaning to each provision, the effect of a change of venue transfers the case from "one judge to another ... in another district," and precludes a judge who grants a change of venue in one judicial district from following the case to a judicial district where the judge was not elected.

To hold otherwise would permit a claimant to begin his lawsuit in a county in the wrong judicial district, but retain the "wrong" judge when the defendant exercises the virtually automatic transfer of venue to the proper county. *See* NDCC 28–04–06 and 28–04–07. The selection of the judge sought by Thompson, and the sweeping disqualification of the judges in the proper judicial district would contravene the correct procedures for changing a judge detailed in NDCC 29–15–21, and would permit judge-shopping in its worst sense.

■ Here, Judge Smith, a duly-elected judge in the Northeast Central Judicial District, granted a change of venue to Cass County in the East Central Judicial District. Under NDCC 27–05–22 and 27–05–26, the change of venue precluded Judge Smith from presiding over the case outside of the judicial district where he was elected after he transferred the case to a county in another district. Judge Backes, a duly-elected judge in the East Central Judicial District, had jurisdiction to decide this lawsuit.

## III

Thompson asserts the trial court erred in dismissing his lawsuit for failure to exhaust his internal administrative remedies at NDSU. He contends he substantially complied with NDSU's procedures for exhausting his administrative remedies, and argues those remedies were precluded under circumstances analogous to *Hom v. State*, 459 N.W.2d 823 (N.D.1990). We disagree.

In describing our standard of review, the parties have relied upon cases involving dismissals for failure to state a claim upon which relief can be granted under NDRCivP 12(b)(v). *See Williams v. State*, 405 N.W.2d 615 (N.D.1987); *Johnson & Maxwell, Ltd. v. Lind*, 288 N.W.2d 763 (N.D.1980). However, the defendants' motion to dismiss cited both NDRCivP 12(b)(i) and (v), and the trial court explicitly declined to decide whether Thompson's complaint failed to state a claim under NDRCivP 12(b)(v). Instead, the court dismissed under NDRCivP 12(b)(i) for lack of jurisdiction.

■ Although not binding, federal court interpretations of a corresponding federal rule of civil procedure are highly persuasive in construing our rule. *E.g., Larson v. Unlimited Business Exchange of North Dakota*, 330 N.W.2d 518 (N.D.1983). *See* NDRCivP 1, explanatory note. In deciding jurisdiction under FRCivP 12(b)(1), a trial court may consider matters outside the pleadings without converting the proceedings to summary judgment. *Osborn v. United States*, 918 F.2d 724 (8th Cir.1990); *Crawford v. United States*, 796 F.2d 924 (7th Cir.1986); 2A Moore's Federal Practice ¶ 12.07 [2.–1] (1995); 5A Wright and Miller, Federal Practice and Procedure § 1350 (1990). *Compare* NDRCivP 12(b) ("[i]f ... matters outside the pleading are presented to and not excluded by the court, [a 12(b)(v) ] motion must be treated as one for summary judgment and disposed of as provided in Rule 56"). If the jurisdictional facts are not in dispute, appellate review of a jurisdictional decision is de novo. *Osborn; Crawford;* 2A Moore's at ¶ 12.07 [2.–1]. We review this jurisdictional challenge in that context.

[redacted] Under FRCivP 12(b)(1), federal courts have generally held that dismissal for lack of subject matter jurisdiction is appropriate if the plaintiff has failed to exhaust remedies before an administrative agency. *Komninos v. Upper Saddle River Bd. of Ed.*, 13 F.3d 775 (3rd Cir.1994); *Bueford v. Resolution Trust Corp.*, 991 F.2d 481 (8th Cir. 1993); *DiLaura v. Power Authority of State of New York*, 982 F.2d 73 (2nd Cir.1992). *See* 5A Wright and Miller, at § 1350. Our decisions have also consistently required exhaustion of remedies before the appropriate administrative agency as a prerequisite to making a claim in court. *Lapp v. Reeder Public School Dist. No. 3*, 544 N.W.2d 164 (N.D.1996); *Medical Arts Clinic v. Franciscan Initiatives*, 531 N.W.2d 289 (N.D.1995); *Tooley v. Alm*, 515 N.W.2d 137 (N.D.1994); *Transportation Division v. Sandstrom*, 337 N.W.2d 160 (N.D.1983); *Shark Bros., Inc. v. Cass County*, 256 N.W.2d 701 (N.D.1977). Failure to exhaust administrative remedies generally precludes making a claim in court.

[redacted] We have also applied the doctrine of exhaustion of administrative remedies to employment cases. In *Soentgen v. Quain & Ramstad Clinic, P.C.*, 467 N.W.2d 73 (N.D. 1991), a doctor failed to exhaust her internal administrative remedies at a hospital, and, instead, sued the hospital for wrongful discharge. We observed that the doctor's wrongful discharge claim could have been resolved at a hearing under the hospital's internal administrative procedures. Because the doctor had failed to exhaust her internal administrative remedies at the hospital, we affirmed the dismissal of her wrongful discharge claim against the hospital.

## IV

Here, Thompson's employment agreement with NDSU was specifically governed by the NDSU University Senate Policy Implementing Procedural Regulations and by the State Board Regulations. *Hom* (regulations are part of teacher's employment contract). Section 605(c) of the State Board Regulations outlines specific internal procedures for nontenured, probationary faculty to seek review of a university's nonrenewal decision.[4]

4. The relevant part of Section 605 says:

C. NONRENEWAL OF APPOINTMENT OF PROBATIONARY FACULTY

* * * * * *

2. When a decision not to renew a probationary appointment has been reached, the faculty member involved shall be informed of that decision in writing by the individual or chair of the body making the decision. If the faculty member so requests in writing within seven calendar days after receipt of notice, he or she will be advised of the reasons which contributed to that decision within seven calendar days after receipt of the request. The faculty member may within fifteen calendar days after receipt of the stated reasons request a reconsideration by the deciding body or individual and a written confirmation of the reasons given in explanation of the nonrenewal. The results of the reconsideration must be provided in writing to the faculty member within fifteen calendar days after receipt of the request.
3. If within sixty calendar days after receipt of notice of nonrenewal, the faculty member alleges that the nonrenewal decision was based on inadequate consideration, a Special Review Committee shall review the faculty member's allegations and determine whether the decision was the result of inadequate consideration in terms of relevant standards of the institution. The term "inadequate consideration" shall be interpreted to refer to procedural rather than substantive issues and shall not mean that the Special Review Committee should substitute its own judgment on the merits of whether the faculty member should be reappointed or given tenure. If the Special Review Committee believes that adequate consideration was not given, it shall request reconsideration, indicating the respects in which it believes the consideration may have been inadequate. It shall provide copies of its report to the faculty member, the recommending body or individual, the president, and other appropriate administrative officers. Allegations involving the adequacy of consideration shall not be subject to further review by the Standing Committee on Faculty Rights or the Board.
4. If a faculty member on probationary or special appointment alleges, within sixty calendar days after receipt of notice of nonrenewal, that the nonrenewal decision was based significantly on considerations violative of (a) academic freedom, (b) rights guaranteed by the United States Constitution, or (c) rights previously conferred by written agreement, the allegation shall be given preliminary consideration by a Special Review Committee, which shall seek to settle the matter by informal methods. The allegation shall be accompanied by a statement that the faculty member agrees to the presentation, for the consideration of the faculty committees, of such reasons and evidence as the

█ Section 605(c)(2) directs that a nonrenewed faculty member "shall be informed of [the nonrenewal] decision in writing by the individual or chair of the body making the decision." Within seven days after receipt of the notice of nonrenewal, the faculty member may request written reasons for the decision to terminate, and the institution must supply the reasons that contributed to the nonrenewal decision within seven days of receipt of the request. The faculty member then has fifteen days to request reconsideration of the nonrenewal decision, and the institution must respond within fifteen days after receipt of the request for reconsideration.

Section 605(c)(3) says that, within sixty days after receipt of notice of a nonrenewal decision, the faculty member may request review by a Special Review Committee to determine if the nonrenewal decision was the result of "inadequate consideration." Under this subsection, "inadequate consideration" is confined to a procedural meaning, and it is not given a substantive meaning. The Special Review Committee is expressly prohibited from substituting its judgment on the merits of whether a faculty member should be reappointed or given tenure.

Section 605(c)(4) declares that, if within sixty days after receipt of notice of a nonrenewal decision, a faculty member alleges the nonrenewal decision violated academic freedoms, constitutional rights, or contractual rights, a Special Review Committee shall consider the allegation by informal methods. If the allegation is not resolved by the Special Review Committee, the matter shall be heard by a Standing Committee on Faculty Rights, and the faculty member must prove by clear and convincing evidence that the allegation was based significantly on the alleged improper consideration. If the faculty member establishes a prima facie case before the Standing Committee on Faculty Rights,

those making the nonrenewal decision must produce evidence to support the nonrenewal.

In *Hom*, we considered whether a university had substantially complied with Section 605(c)(2) in terminating a nontenured, probationary professor. In *Hom*, the professor requested written reasons for a nonrenewal decision within seven days after receipt of a nonrenewal notice, and the university delayed furnishing the professor with the termination reasons for more than seven months. We explained that the purpose of the regulation's well-delineated timetable for expedited review of the reasons for nonrenewal was to guarantee prompt resolution of the matter. We concluded the university's violation of the seven-day requirement for furnishing the professor with reasons for nonrenewal was more than a technical violation. *Compare Stensrud v. Mayville State College*, 368 N.W.2d 519 (N.D.1985) (timely notification by different method than specified in regulation was substantial compliance). In *Hom* we held that the seven-month delay was not substantial compliance with the nonrenewal procedure.

Here, Peterson, the chair of the history department, notified Thompson that the tenured faculty of the history department had "voted to recommend" that his probationary appointment should not be renewed. Thompson asked Peterson for a statement of reasons for his nonrenewal. Thompson contends that his request was properly directed to the "chair of the body making the decision" under Section 605(c)(2). He also argues that, at a minimum, he substantially complied with Section 605(c)(2), because his request to Peterson was part of the record before NDSU President Ozbun. We reject Thompson's arguments.

█ The tenured faculty of the history department did not make the final decision for nonrenewal of Thompson's nontenured

institution may allege in support of this decision. If the allegation is unresolved at this stage, and if the Special Review Committee so recommends, the matter shall be heard by the Standing Committee on Faculty Rights in accordance with the procedures in Section J, except that the faculty member making the complaint shall be responsible for stating the grounds upon which it is based and must

prove by clear and convincing evidence that the nonrenewal was based significantly on the alleged improper consideration. If the faculty member succeeds in establishing a prima facie case before the Standing Committee on Faculty Rights, it shall be incumbent upon those who made the nonrenewal decision to come forward with evidence in support of their decision.

employment; instead, the tenured faculty "voted to recommend" nonrenewal. Section 351C.2 of the NDSU University Senate Policy Implementing Procedural Regulations, incorporated in Thompson's employment agreement with NDSU, directs that "[n]onrenewal decisions shall be made in every instance by the University President, following recommendations by the dean or director, and the promotion, tenure and evaluation committee of the college or equivalent unit." That regulation, when read together with Section 605(c)(2) of the State Board Regulations, unambiguously declares that, at NDSU, the university president makes all nonrenewal decisions. The obvious purpose of those regulations is to apprise the decision maker, the NDSU president, that reasons for the nonrenewal are necessary. A premature request directed to someone other than the actual decision maker does not fulfill that purpose, nor does it serve to trigger the well-delineated timetable for expedited review of the decision maker's reasons for nonrenewal. The regulations do not require a decision maker to search the "record" for a premature request for reasons for nonrenewal.

When Thompson asked Peterson for reasons for the nonrenewal, NDSU President Ozbun had not made a nonrenewal decision. Peterson specifically informed Thompson that nonrenewal decisions were made by the university president and that the president had not yet made a decision in his case. NDSU President Ozbun notified Thompson on May 13, 1994, that his contract was not being renewed and specifically invited Thompson to consult NDSU policies regarding his further procedural rights. However, Thompson did not pursue any further administrative procedure at NDSU and, instead, sued the defendants. Unlike the professor in *Hom,* Thompson failed to trigger the administrative review process by requesting reasons for the nonrenewal from NDSU President Ozbun-the "individual ... making the [nonrenewal] decision." We hold, as a matter of law, that Thompson's premature request for reasons for nonrenewal, directed to Peterson rather than to NDSU President Ozbun, did not substantially comply with NDSU's administrative procedures.

## V

Thompson asserts that the doctrine of exhaustion of remedies does not apply to his constitutional claims. He relies upon *Froysland v. North Dakota Workers Compensation Bureau,* 432 N.W.2d 883 (N.D. 1988); *Johnson v. Elkin,* 263 N.W.2d 123 (N.D.1978); and *Family Center Drug Store, Inc. v. North Dakota State Board of Pharmacy,* 181 N.W.2d 738 (N.D.1970). Those precedents generally hold that the constitutionality of an act administered by an agency may be raised for the first time on appeal to the district court.

Those decisions do not abolish the requirement for exhaustion of administrative remedies. Section 605(c)(4) of the State Board Regulations specifically contemplates administrative consideration of constitutional claims. There is no indication Thompson could not have developed his constitutional claims in the administrative process. We decline to speculate on the resolution of those claims if Thompson had raised them in the designated administrative forum. *Cf. Southeast Human Service Center v. Eiseman,* 525 N.W.2d 664 (N.D.1994) (declining to speculate on result if employee had complied with employer's reasonable request for employee to submit to doctor's examination).

Moreover, as a nontenured, probationary teacher, Thompson had no right to continued employment beyond the duration of his contract, and he possessed no constitutionally protected property interest in continued employment. *Stensrud. Compare Morris v. Clifford,* 903 F.2d 574 (8th Cir.1990) (tenured faculty member can be dismissed only for adequate cause and has constitutionally protected property interest in continued employment). Thompson's failure to exhaust the administrative remedies in his contract with NDSU precludes him from now raising those constitutional claims.

## VI

We hold that the trial court properly dismissed Thompson's lawsuit for lack of juris-

diction.[5]  We therefore affirm the judgment.

VANDE WALLE, C.J., SANDSTROM and NEUMANN, JJ., and BERYL J. LEVINE, Surrogate Judge, concur.

The Honorable Mary Muehlen Maring was not a member of the Court when this case was heard and did not participate in this decision.

---

**5.**  The defendants have made additional arguments as alternative grounds for sustaining the judgment. *Olson v. University of North Dakota*, 488 N.W.2d 386 (N.D.1992) (appellee entitled to attempt to save trial court judgment by urging any ground asserted in trial court). Thompson has not responded to many of these alternative arguments.  However, Thompson's failure to exhaust his administrative remedies is dispositive of this appeal, and we need not consider the defendants' other arguments for sustaining the trial court judgment.